No. 22-1129

_____

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

## UNITED STATES OF AMERICA

v.

## GAMAL ABDELAZIZ,
Defendant-Appellant.

_____

On Appeal from the U.S. District Court
for the District of Massachusetts
No. 19-cr-10080
Hon. Nathaniel M. Gorton

_____

## BRIEF OF DEFENDANT-APPELLANT
## GAMAL ABDELAZIZ

_____

Brian T. Kelly
Joshua C. Sharp
Lauren A. Maynard
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
(617) 345-1000
bkelly@nixonpeabody.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES…………………………………………………………iii

INTRODUCTION……………………………………………………………………1

JURISDICTIONAL STATEMENT………………………………………………7

STATEMENT OF THE ISSUES………………………………………………...7

STATEMENT OF THE CASE……………………………………………………7

    A. The Wiretap……………………………………………………………………7

    B. The Indictment, The Misconduct, And The Pre-Trial Rulings…9

    C. The Evidence At Trial…………………………………………………12

    D. Conviction, Sentence, And Appeal………………………………21

SUMMARY OF THE ARGUMENT……………………………………………21

STANDARD OF REVIEW………………………………………………………25

ARGUMENT………………………………………………………………………26

    I.    A Payment To A Victim Is Not A Bribe………………………26

    II.    An Admissions "Offer" Is Not Property…………………………28

    III.    There Was A Prejudicial Variance……………………………29

        A. The Variance……………………………………………………………29

        B. Prejudicial Spillover……………………………………………36

        C. Venue………………………………………………………………………36

            i.    Singer Calls To Abdelaziz……………………………37

        ii.     Singer Call To Heinel.....................................39

        iii.    Check............................................................40

IV.   The District Court Erroneously Excluded Critical Defense
      Evidence.........................................................................42

      A. USC Evidence...........................................................42

      B. Hearsay....................................................................47

      C. Singer Evidence........................................................54

V.    The "Consensual Wiretap" Recordings Should Have Been
      Suppressed.....................................................................55

      A. Background...............................................................55

      B. Section 2511(2)(a)(ii)...............................................57

      C. Suppression.............................................................61

      D. Timeliness...............................................................62

CONCLUSION.......................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Application of United States.*,
  128 F. Supp. 3d 478 (D.P.R. 2015).....................................61

*Berger v. New York*,
  388 U.S. 41 (1967)..................................................59

*California v. Green*,
  399 U.S. 149 (1970)................................................49

*Cheek v. United States*,
  498 U.S. 192 (1991)................................................44

*Grunewald v. United States*,
  353 U.S. 391 (1957)............................................38, 39

*Ingram v. United States*,
  360 U.S. 672 (1959)................................................34

*Kelly v. United States*,
  140 S. Ct. 1565 (2020).............................................22

*Kotteakos v. United States*,
  328 U.S. 750 (1946).................................................4

*Mutual Life Ins. Co. v. Hillmon*,
  145 U.S. 285 (1892)................................................48

*In re Operation Varsity Blues Prosecution*,
  1:19-mc-91134-PBS (D. Mass. Apr. 9, 2019).........................9

*Skilling v. United States*,
  561 U.S. 358 (2010)............................................22, 27

*United States v. Arias*,
  848 F.3d 504 (1st Cir. 2017).......................................26

*United States v. Bizzack,*
No. 19-cr-10222-DPW (D. Mass. Nov. 5, 2019) .................................. 3

*United States v. Borelli,*
336 F.2d 376 (2d Cir. 1964) .............................................. 30

*United States v. Burgos-Montes,*
786 F.3d 92 (1st Cir. 2015) .............................................. 26

*United States v. Ciresi,*
697 F.3d 19 (1st Cir. 2012) .............................................. 38

*United States v. Dellosantos,*
649 F.3d 109 (1st Cir. 2011) ............................................. 25

*United States v. Diallo,*
40 F.3d 32 (2d Cir. 1994) ................................................ 44

*United States v. Dockray,*
943 F.2d 152 (1st Cir. 1991) ............................................. 43

*United States v. Dowdell,*
595 F.3d 50 (1st Cir. 2010) .............................................. 26

*United States v. Ernst,*
502 F. Supp. 3d 637 (D. Mass. 2020) .............................. 4, 22

*United States v. Ernst,*
No. 19-cr-10081-IT (D. Mass. Oct. 25, 2021) ....................... 63

*United States v. Evans,*
970 F.2d 663 (10th Cir. 1992) ...................................... 31, 35

*United States v. Fernandez,*
722 F.3d 1 (1st Cir. 2013) ............................................... 43

*United States v. Franco-Santiago,*
681 F.3d 1 (1st Cir. 2012) ............................................ 23, 34

*United States v. Georgiadis,*
819 F.3d 4 (1st Cir. 2016) ............................................... 41

*United States v. Giordano*,
   416 U.S. 505 (1974) ............................................................... 61

*United States v. Glenn*,
   828 F.2d 855 (1st Cir. 1987) ................................. 23, 35, 37

*United States v. Gorski*,
   880 F.3d 27 (1st Cir. 2018) ................................................ 43

*United States v. Hayes*,
   40 F.3d 362 (11th Cir. 1994) ............................................. 53

*United States v. Hoffman*,
   832 F.2d 1299 (1st Cir. 1987) .......................................... 57

*United States v. King*,
   272 F.3d 366 (6th Cir. 2001) ............................................. 41

*United States v. Lankford*,
   955 F.2d 1545 (11th Cir. 1992) ......................................... 44

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) .............................................. 47

*United States v. Lopez*,
   300 F.3d 46 (1st Cir. 2002) ................................ 59, 61, 62

*United States v. McLellan*,
   959 F.3d 442 (1st Cir. 2020) ...................................... 25, 26

*United States v. Monserrate-Valentin*,
   729 F.3d 31 (1st Cir. 2013) ........................................ 30, 31

*United States v. Onumonu*,
   967 F.2d 782 (2d Cir. 1992) ....................................... 44, 45

*United States v. Piper*,
   35 F.3d 611 (1st Cir. 1994) ............................................... 42

*United States v. Richardson*,
   225 F.3d 46 (1st Cir. 2000) ............................................... 34

*United States v. Rommy*,
    506 F.3d 108 (2d Cir. 2007) ............................................................. 38

*United States v. Sawyer*,
    85 F.3d 713 (1st Cir. 1996) ............................................................. 43

*United States v. Thompson*,
    484 F.3d 877 (7th Cir. 2007) ........................................................... 27

## Statutes

18 U.S.C. § 2511(2) ............................................................... *passim*

18 U.S.C. § 2518 ....................................................................... 61

28 U.S.C. § 1291 ........................................................................ 7

## Other Authorities

30 Fed. Prac. & Proc. Evid. § 6572 (2d ed.) ............................... 52

Fed. R. App. P. 32 ..................................................................... 65

H.R. Rep. No. 95-1283 (1978) .................................................... 58

# INTRODUCTION

By the time college counselor Rick Singer told Gamal Abdelaziz that a donation could help his daughter Sabrina get into USC, Abdelaziz had known Singer for over 5 years, and Singer had already helped two of his children get into college through the regular admissions process. Abdelaziz trusted Singer, so much so that he allowed his high-school aged son to travel across the country with Singer and participate in community service activities sponsored by Singer's Key Worldwide Foundation. Singer was one of his son's mentors.

With this background, Singer told Abdelaziz that he could help Sabrina get into USC if Abdelaziz made a donation to USC's athletic department and Sabrina went through the athletic admissions process as a basketball practice player or team manager. Abdelaziz agreed. Sabrina was not a Division I caliber basketball player, but she played basketball her first two years of high school and it remained one of her interests.

The government admitted Abdelaziz's donation was intended for USC. The lead prosecutor told the jury: "There's no dispute about that."

And while there was someone at USC—Senior Associate Athletic Director Donna Heinel—helping students get admitted, an FBI agent swore an affidavit stating that when Sabrina was admitted, Heinel was directing all funds into *bona fide* USC accounts. And it was undisputed Abdelaziz did not know who Heinel was. Nor was the donation program limited to Singer's clients. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ SA116.[1]

Those are—more or less—the facts of Abdelaziz's case. There was no cheating on the SAT or ACT, no taking fake classes, no lining the pockets of college coaches, no photo-shopping fake pictures. Abdelaziz thought he was making a donation *to USC* in exchange for favorable admissions treatment for Sabrina. And for that he was charged with and

---

[1] Citations prefixed with "Add." are to the addendum to this brief, those prefixed with "Wilson Add." are to the addendum to Appellant Wilson's brief, those prefixed with "A" are to the joint appendix, and those prefixed with "SA" are to the sealed joint appendix.

convicted of conspiracy to commit wire/mail fraud, honest services wire/mail fraud, and federal programs bribery, and sentenced to one year and a day in prison.

The government's legal theories in this case were unprecedented and wrong. Outside of "Varsity Blues," there has never been another case—anywhere and ever—where a payment to the very entity deprived of its honest services constituted the "bribe" required for conviction. No wonder that, when Judge Woodlock confronted the government's theory in a related "Varsity Blues" case, his puzzlement came across loud and clear:

> That's not a bribe, is it? It's received by USC . . . . That's a different issue from bribery, right?. . . . [T]his is a case in search of a bribe or kickback.

*See* Bizzack Sent. Tr., ECF 34 at 15-16, *United States v. Bizzack*, No. 19-cr-10222-DPW (D. Mass. Nov. 5, 2019). But the district court in this case instructed the jury that a payment to USC could be a bribe, virtually guaranteeing Abdelaziz's conviction.

The district court also made the fundamental legal error of treating an *offer* of admission to a university as property, thereby paving the way for Abdelaziz's conviction on the property fraud theory. In a separate

session, Judge Talwani came to the exact opposite conclusion, holding that offers of admission were not property and invoking the Supreme Court's repeated refrain that "the federal property fraud statutes should not be used as a backdoor for expanding the scope of federal criminal jurisdiction without a clear statement by Congress." *United States v. Ernst*, 502 F. Supp. 3d 637, 652 (D. Mass. 2020). Indeed, under the government's theory, "any false statement in an application for admission, whether to pre-kindergarten or to college, would constitute a federal offense punishable by up to twenty years in prison." *Id.*

Regretfully, these grave legal errors were not the only source of profound unfairness in the proceedings below. First, the government charged Abdelaziz in a single, coast-to-coast conspiracy consisting of all of Singer's customers (whom Abdelaziz did not know and never interacted with). In other words, Abdelaziz was charged with precisely the type of conspiracy proscribed by the Supreme Court in *Kotteakos v. United States*, 328 U.S. 750 (1946). The government then used evidence of *other parents'* guilt to overcome Abdelaziz's good faith defense. In fact, the whole case became about *other parents*, and although the jury heard a guilty cooperating parent testify as to *his own* understanding of the

conspiracy *he* joined, the government failed to present even a single witness who ever had a conversation with Abdelaziz.

The trial was further tainted by the district court's exclusion of nearly all of Abdelaziz's evidence. This included all evidence showing the relationship between donations and admissions at USC, which the magistrate judge described as "a very basic fact that you need to get across to a jury to support your defense." A4162. The district court also excluded all evidence showing that Singer regularly described "donations for admission" as an above-board, legitimate way to gain acceptance to selective universities, *see* SA1113 (█████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████ ), while at the same time permitting the government to introduce piles of evidence showing the nefarious manner in which Singer described his program to other parents. The evidentiary errors were compounded by two extremely prejudicial hearsay rulings which directly contradicted black letter law. And it was all topped off by the introduction of recordings made through a so-called "consensual

wiretap" where AT&T tapped Singer's phone for five months on an AUSA's "say so" that he had Singer's consent and without any court authorization.

## STATEMENT OF ISSUES

1. Can a payment to a victim satisfy the "bribe or kickback" element of the honest services fraud and federal programs bribery statutes?

2. Is an *offer* of admission to a university "property" under the federal fraud statutes?

3. Did the proof vary from the indictment, which alleged a single, nationwide conspiracy including all of Singer's customers? And if so, was the variance fatal where it resulted in admission of prejudicial evidence regarding other parents' guilt, undermining Abdelaziz's good faith defense, and there was no venue in Massachusetts?

4. Is a new trial warranted where the district court excluded: (1) all evidence showing USC regularly admitted students through the athletic department in exchange for donations; (2) evidence showing Singer's description of the "side door" as legitimate; and (3)

on cross-examination, evidence showing that Singer's team falsified Abdelaziz's daughter's USC application behind Abdelaziz's back?

5. Does Title III permit a telephone service provider to deliver its technical assistance to law enforcement in intercepting phone calls without a court order?

## JURISDICTIONAL STATEMENT

The district court entered final judgment on February 16, 2022, Add.1, and amended the judgment on February 23, 2022, Add.9. Abdelaziz noticed this appeal on February 23, 2022. ECF 2540. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

### A. The Wiretap[2]

The "Varsity Blues" investigation began in earnest when a Yale soccer coach's bribery scheme led the government to Rick Singer, a California-based college consultant and the center of the "college admissions scandal." A1252-54. As part of the government's

---

[2] This Statement focuses on facts most relevant to Abdelaziz's individual arguments. For a more thorough discussion of the general facts relevant to this case, the Court is respectfully directed to Wilson's Statement of the Case, which is hereby incorporated by reference.

investigation, the district court issued Title III wiretap authorizations for Singer's phone number ending in 8802 spanning from June to September 2018. *See* A549, A3899. In October 2018, the government informed the district court (Burroughs, J.) that the wiretap ceased at midnight on September 27, 2018 and that Singer, now cooperating, was "placing consensual calls to various target subjects." A3899-3900. However, the wiretap did not cease on that date and in fact continued for an additional five months, until March 14, 2019, without any court authorization or supervision. A549, A3900; ECF 2128 at 2. The government had created what it called a "consensual wiretap," based on Singer's alleged consent, and these recorded calls became the heart of the government's case. *See id.*; A3902.

The purported justification for the "consensual wiretap" was a misdated letter to AT&T seeking technical assistance for interception of Singer's "8802" phone and a misdated consent form executed by Singer purporting to authorize the recording of phones "provided to or made available to me by law enforcement." *See* ECF 2128; A361-62. But the phone actually provided and made available to Singer by law enforcement was unmonitored precisely so Singer's conversations with

8

law enforcement would *not* be recorded. *See* A326. Singer's 8802 phone was his *personal* phone (for which no written consent existed). When all was said and done, AT&T facilitated a continuous wiretap on Singer's 8802 phone from June 5, 2018 to March 14, 2019, with all recordings after September 27, 2018 taking place without court authorization. A549, A3899.

## B. The Indictment, The Misconduct, And The Pre-Trial Rulings

On March 5, 2019, David Sidoo was indicted in connection with a scheme to have his son cheat on standardized tests. ECF 1. His case was assigned to Hon. Nathaniel Gorton. Hoping to try all of the parents before a judge they thought was favorable, government counsel sought and obtained a superseding indictment against Sidoo, Abdelaziz, and seventeen other parents, which was filed on April 9, 2019. ECF 314. The defendants unsuccessfully protested that the government's actions manipulated the "wheel" system for case assignment established by the local rules. Ltr. From Defense Counsel, ECF 1 at 1-2, *In re Operation Varsity Blues Prosecution*, 1:19-mc-91134-PBS (D. Mass. Apr. 9, 2019).

The pre-trial proceedings were lengthy. There was a plethora of issues related to the government's misconduct in its dealings with Singer

and its failure to disclose *Brady* material. *See* ECF 971, 972. For instance, the government touted the above-referenced "consensual wiretap" calls as its marquee evidence, but nearly one year after the indictment, in late February 2020, the government disclosed a highly exculpatory October 2018 note that Singer wrote to himself regarding those calls:[3]

> Loud and abrasive calls with agents. They continue to ask me to tell a fib and not restate what I told my clients as to where there [sic] money was going—to the program not the coach and that it was a donation and they want it to be a payment. I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking questions. Essentially they are asking me to bend the truth…. [Agent] raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling them.

A314-15, A4208.

As indicated in Singer's notes, the government initially tried to muddle whether the defendants thought they were making payments to an *individual* or to a *university.* A4208. In the words of Magistrate Judge Kelley, "this is a very complicated situation and it's ugly." A310. For

---

[3] The government acknowledged that it was aware of this "note" by late October 2018 but waited almost 16 months to disclose it. A314-15.

instance, the government's premier evidence against Abdelaziz was an October 25, 2018 call in which Singer tried to get Abdelaziz to agree that "$300,000, um, was paid to . . . [USC Athletic Administrator] Donna Heinel at USC to get [Abdelaziz's daughter] into school." A4664. But FBI reports that trickled out more than a year after the indictment showed that Singer told the government: "ABDELAZIZ *did not know about* HEINEL" and "knew the money was going *to the school.*" A318 (emphasis added). Indeed, FBI notes describe Singer as saying: "Donna *diverted* some of the money. Gamal *didn't know* about Donna." A368 (emphasis added). In light of these disclosures, the government was forced to admit—as part of the misconduct proceedings—that it "was not attempting to build a case that the parents understood [USC Athletic Administrator] Heinel to be personally pocketing money, and the government has never alleged that." A376.

As the government made further disclosures, it also became clear they never properly controlled Singer as an informant. Singer used at least four phones while an informant. A324-27. And forensic images of Singer's phones revealed he deleted thousands of text messages prior to having his phone imaged, and continued to delete text messages

throughout his cooperation. A2197-200, A4871-75. The government brushed off any suggestion of improprieties and the district court denied the defendants' request for an evidentiary hearing. ECF 1169 at 10-11.

The defendants filed a number of pre-trial motions, including—as relevant to this appeal—motions to dismiss based on the theories that payments to victims cannot be bribes, that admissions offers are not "property," that the indictment charged a "rimless wheel conspiracy," and lack of venue. The defendants also filed a motion to strike portions of the indictment related to a Singer-Heinel "side deal" (*see infra*, Statement of the Case, C.) to personally enrich Heinel, which, as the government admitted, Abdelaziz did not know about, and did not even exist until after Abdelaziz's daughter was admitted to USC. ECF 1020, 1032, 1038, 1042, 1245. All pre-trial motions were denied without a hearing. Wilson Add. 1; ECF 1402.

## C. The Evidence At Trial

The evidence at trial established that Abdelaziz was introduced to Singer as a legitimate and well-respected college counselor. A1262-64. Singer helped prepare both of Abdelaziz's older children, Sarah and Adam, for college admission. *See* A2168, A2987-88. There was no

allegation of anything improper about his counseling services for Sarah and Adam. In fact, Singer became a mentor to Adam, a relationship that Abdelaziz encouraged. A2168, A2184. As part of Adam's college admission process, Adam and Abdelaziz were introduced to the Key Worldwide Foundation as a legitimate charitable organization. A2180-82. Adam even traveled with Singer and others to Atlanta, GA to participate in community service activities sponsored by the Key Worldwide Foundation. *Id.* Adam was ultimately admitted to Columbia University and, after Adam was admitted, Abdelaziz donated $200,000 to Columbia. A2151. Even on the government's October 2018 "consensual wiretap," Abdelaziz encouraged Singer to continue mentoring Adam, which is inconsistent with any awareness of involvement in a criminal conspiracy with Singer. A2184, A4667.

By the time Abdelaziz's youngest daughter Sabrina was applying to college, Abdelaziz and his family had moved to Hong Kong. A1320, A2152-53. As counsel stated during opening, Singer informed Abdelaziz that one of Sabrina's top choices, USC, provided preferential admissions treatment to students like Sabrina who could assist athletic teams as practice players or team managers and whose parents donated to the

athletic department. A1016. The practice player / team manager explanation was part of Singer's standard "pitch" to parents. *See* A1153-56, A1169-70, A1710-12, A2416-19. Indeed, Singer's website even contained testimonials from former clients thanking Singer for helping them obtain spots as managers on their colleges' teams. A4890-91. Although Sabrina played basketball her freshman and sophomore years of high school, she did not play basketball in her junior or senior years and was therefore not able to contribute as a starting player on a Division I basketball team. A1624, A1629-33.

Abdelaziz agreed with Singer to make a donation to USC and to pursue the suggested avenue of admission for Sabrina, *see, e.g.*, A1321-24, A4486, A4489, which included highlighting basketball as an interest in her application and essay, A1682-85. At no time did Singer ever disclose that a payment would be made to an individual. Instead, as the government has admitted on multiple occasions, Singer told Abdelaziz, and Abdelaziz believed, that he was donating *to USC.* A318, A376, A995, A3653 (prosecutor stating in closing that "Singer told the defendant the money would go to USC. There's no dispute about that.").

As part of the process, Singer stated that a "profile" must be submitted to USC. Singer requested, and Abdelaziz provided, information regarding Sabrina's candidacy and pictures of her playing basketball that Abdelaziz's wife took at her high school games. A4444-60. The government did not introduce any evidence that Abdelaziz provided false or inaccurate information either to Singer or to USC.[4] Instead, the government showed that *Singer* ultimately provided a false athletic profile to USC and that false information was ultimately included on Sabrina's USC application. A1294-96, A4467-71. This left unresolved whether Abdelaziz was aware that the profile and application included false information.

With respect to the athletic profile, Singer associate Laura Janke testified that she created the false profile by herself and never communicated with Abdelaziz. A2547. Janke simply searched the

---

[4] On July 27, 2017, within a span of two minutes, Abdelaziz sent Singer five photographs his wife had taken at one of Sabrina's basketball games. Four of the photos contained Sabrina. Abdelaziz also included, clearly by accident, one photo that did not include Sabrina, and Singer chose that photo to use in the profile. *See* A4446-61. When Singer replied to that photo saying "[w]e will use this one," he did not forward the image itself, so Abdelaziz would not have known which photo Singer was referring to unless he somehow memorized and compared the numeric filenames of the JPEG images. A1535-42, A4461.

internet to find false accolades to add to Sabrina's profile. A2530-32. Singer hid from Abdelaziz the communications from Janke indicating that she would "create" information on the profile. A2549-50, A4444.

There was no direct evidence that Abdelaziz saw the false athletic profile. Instead, the government introduced (through an FBI agent acting as a "reader") an August 8, 2017 email in which Singer attached the profile and asked Abdelaziz a question. A1291-92, A4465. The email was sent to the address gamalaziz@cox.net. A4465. The FBI agent confirmed on cross-examination that there was no evidence that Abdelaziz ever read or responded to the email, or answered the question asked in the email. A1529-31.

On cross-examination, counsel introduced an "auto-reply" from the gamalaziz@cox.net account sent to Singer thirteen seconds after Singer's initial email. A1531-32. The "auto-reply" stated:

> Please be advised that I've changed my e-mail address to gamalaziz797@gmail.com.

A1532, A4938. The FBI agent testified that the prosecutors never showed him this "auto-reply" email. A1532. Nor did prosecutors show him Singer's subsequent email attaching the false profile and sent just minutes later, but to the incorrect email address,

amalaziz797@gmail.com (missing the leading "g"). A1532-35, A4463.[5] The FBI agent acknowledged that the email to amalaziz797@gmail.com address was "in cyberspace" and that the emails he saw for the first time on cross-examination may explain why Abdelaziz never responded to Singer. A1534.

As to the USC application, Singer employee Mikeala Sanford submitted Sabrina's application to USC, A1686, A1770, A2415,[6] and generally did not ask families to review applications before submission, A1716. The government introduced a January 5, 2018 12:39 p.m. email from Sanford to Abdelaziz in which she stated: "I have to confirm a few things with Rick [Singer] before I can submit [the application]. I will confirm when USC [application] is in." A1684-85, A4492. On direct examination, the government asked Sanford (who pled guilty and has a cooperation agreement) what she needed to confirm, and she responded

---

[5] The FBI Agent testified that the original "cox" email was found in a search warrant return for Abdelaziz's gmail account served in July 2019, but that he did not know how or when it was transferred to that account, only that there were many possible explanations. A1546-47, A1617. He further testified that he was familiar with the concept of someone indicted in March 2019 going back and looking at old emails on his old devices. A1618.

[6] Sabrina gave Sanford her login credentials at some point. A1772.

"That I don't remember." A1685. On cross-examination, Sanford testified that the government never showed her any emails that would explain what she needed "to confirm." A1743-45. At that point, defense counsel attempted to introduce three exhibits showing Sanford asked Singer for the fake profile in a side-email chain (cutting out Abdelaziz) so that she could update Sabrina's USC application with false credentials and without Abdelaziz's knowledge. A1745-49, A1793-95, A1800. These three emails were:

- Exhibit 1540: 7:17 PM. "Please send Profile for Sabrina Aziz." There is no other text. A4881.

- Exhibit 1254: 8:40 PM. Singer sends Sabrina's false profile (already in evidence as Exhibit 351). There is no text. A4850.

- Exhibit 1255: 8:43 PM. "Thanks. Will update her app and submit." There is no other text. A4853.

The district sustained the government's hearsay objections to all three exhibits, stating "I don't see how this is admissible."[7] A1746. After reviewing the emails, Sanford initially claimed they didn't refresh her recollection but that—contrary to the documents—"I never asked for a

_____

[7] With respect to this email, the AUSA objected: "He's putting it in for the truth of whether or not a profile was requested." A1794.

profile—or an athletic profile from Rick Singer." A1746. She also testified that she "can't say either way" if she added false information to Sabrina's application. A1751. Because the district court excluded the relevant exhibits, defense counsel was not able to effectively cross-examine Sanford on these points.

Sabrina was provisionally admitted to USC on October 9, 2017, prior to her complete application being submitted. A1307-08, A4480. She received her final admission to USC in March 2018.[8] On March 26, 2018, Abdelaziz wired $300,000 to the Key Worldwide Foundation. A2986-87. As the government admitted on multiple occasions, Abdelaziz believed that this money would be directed *to USC.* A318, A376, A995, A3653.

Although, as noted above, Abdelaziz did not know who Heinel was, the government introduced a voicemail from Heinel to Singer suggesting that Singer should direct Abdelaziz's donation toward the Galen Center gift account, which is the basketball arena at USC. A1324, A4489. The Galen Center gift account was a bona fide USC account, and funds in that

---

[8] USC Admissions Officer Rebecca Chassin testified that students admitted through athletics can receive a provisional admission prior to submitting a full application. A1807-08. Final admissions decisions are typically sent out at the end of March. A1803.

account were only used for USC-authorized purposes, as stipulated by the parties. A3213. According to a sworn affidavit from an FBI Agent, prior to the summer of 2018, Heinel never personally took any money from Singer.[9] A3293, A4939-44. But several months after Sabrina was admitted to USC, in July 2018, Heinel began receiving $20,000 personal payments. A2990. This was apparently pursuant to a "side deal" between Singer and Heinel that was unknown to Abdelaziz. A318, A376, A995, A2414-15, A3653. Immediately after Singer became a government agent (almost a year after Sabrina's provisional admission—when she was already a student at USC), Singer, at a federal agent's request, had Heinel add "details" to an invoice which resulted in Sabrina's name appearing on a $20,000 invoice which Heinel then sent to Singer for payment. A2191-93, A4697-98. Counsel objected to this evidence, because the government admitted Abdelaziz did not know about the payment and admitted Abdelaziz thought his money was going to USC,

---

[9] In an August 30, 2018 sworn affidavit in support of a wiretap application, FBI Special Agent Laura Smith told Judge Burroughs that "Up until the summer of 2018, I believe that all the money SINGER provided to HEINEL for her assistance went to USC athletic programs." A3293, A4939-44. Sabrina was provisionally admitted to USC on October 9, 2017 and received her final acceptance in March 2018.

not to an individual. *See* ECF 2010; A2121-23. Nonetheless, the motion in limine was denied, the trial objection was overruled, and the jury heard evidence regarding Singer's "side deal" with Heinel that Abdelaziz had nothing to do with. A561-62, A2116-23, A2941-42, A2988-91.

### D. Conviction, Sentence, And Appeal

Abdelaziz was convicted on October 8, 2021 of one count of conspiracy to commit mail fraud, wire fraud, honest services mail fraud, or honest services wire fraud and one count of conspiracy to commit federal programs bribery. A3891-92. He was sentenced on February 9, 2022 to one year and one day in prison and a fine of $250,000. Judgment entered on February 16, 2022, and the judgment was amended on February 23, 2022. Add.1, 9. Abdelaziz appealed on February 23, 2022 to this Court, ECF 2540, which consolidated the appeal with his co-defendant John Wilson.

## SUMMARY OF ARGUMENT

I. The government's theory in this case was that a payment to USC (i.e., the entity allegedly deprived of its honest services) constituted the "bribe or kickback" that satisfied the relevant element of the honest services fraud and federal programs bribery statutes. But outside of

"Varsity Blues" there has never been another case—anywhere and ever—where a payment *to the victim* was considered a bribe. Whatever one might call the payment intended for USC (at worst, unauthorized fundraising), such a payment is not a "paradigmatic" bribe as required by *Skilling v. United States*, 561 U.S. 358 (2010).

II.     An *offer* of admission to a university, where the student will pay the full price of tuition, is not "property." Misrepresentations in applications may implicate other interests of the university, such as the integrity of their processes, but these interests are not *property* interests. Were it otherwise, nearly *any* misrepresentation in *any* application for *anything* would constitute a federal criminal offense. And the Supreme Court has repeatedly warned against reading the federal fraud statutes to create "a sweeping expansion of federal criminal jurisdiction." *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020). Judge Talwani held in a related case that offers of admission are not property. Her holding was correct. *See Ernst*, 502 F. Supp. 3d at 652.

III.     There was no proof that Abdelaziz agreed to join the nationwide, multi-objective conspiracy charged in the indictment. Abdelaziz was a mere customer of Singer. If anything, he conspired with

Singer to get his own daughter into college, but by doing so he did not thereby conspire with all of Singer's *other* customers to get *other* children into college. The district court failed to properly evaluate the evidence in this regard, "focus[ing] on the group rather than on what the agreement was." *United States v. Franco-Santiago*, 681 F.3d 1, 8 (1st Cir. 2012). The variance was fatal because: (1) the prejudicial spillover of evidence of other parents' guilt, which was the focus of the government's case, obscured Abdelaziz's good faith; and (2) there was no venue for any proven conspiracy involving Abdelaziz. *See United States v. Glenn*, 828 F.2d 855 (1st Cir. 1987) (reversing conviction).

**IV.**   The district court's erroneous evidentiary rulings severely prejudiced Abdelaziz. Although a USC admissions officer testified that USC did not offer admission in exchange for donations, the district court excluded all evidence showing that, in fact, USC regularly did so. This was despite the magistrate's finding that USC's admissions practices were "a very basic fact that you need to get across to a jury to support your defense" and that, with respect to the Dean of Admissions' statement that money did not affect admissions, "I don't for a second

believe [the dean's] affidavit that he submitted here, and I think it's belied by many of the documents that we've received." A4162.

Separately, although the district court permitted the government to admit piles of evidence showing Singer's nefarious conversations with other parents, and those *other* parents' acknowledgments of guilt, it excluded all of Abdelaziz's evidence showing Singer regularly and openly described the "side door" program as a legitimate and above-board path for admissions (including in a lecture at Starbucks corporate headquarters). This evidence would have provided critical support for Abdelaziz's good faith defense. Instead, the jury was left with the impression that Singer always told his customers that he was involved in illicit behavior.

Finally, the government weaponized the hearsay rules, repeatedly and tactically asserting baseless objections as the district court continued to misapply basic hearsay doctrine, including hundred-year-old Supreme Court precedent. The undersigned's mid-trial letter copying the United States Attorney suggesting the government was violating its duty of candor in lodging such baseless objections led the government to

withdraw certain of its objections, but not enough of them, and in any case, by that time it was too late.

V.      The unambiguous language of Title III permits telephone service providers to deliver technical assistance to law enforcement in intercepting phone calls *only* upon presentation of: (1) a court order; or (2) a certification of an emergency by the Attorney General or a designated individual. 18 U.S.C. § 2511(2)(a)(ii). There is no third option where technical assistance can be provided upon an AUSA's "say so" that he or she has obtained the target's consent. Yet that is exactly what happened in this case: AT&T facilitated a wiretap of every phone call coming in or going out of Singer's cellphone (with no minimization) for a period of five months after the Title III court order expired. This so-called "consensual wiretap" process is ripe for abuse. In fact, one such abuse occurred in this case because the government obtained written consent for the wrong phone. These recordings should have been suppressed.

## STANDARD OF REVIEW

This Court reviews *de novo*: (i) the sufficiency of the evidence, *United States v. McLellan*, 959 F.3d 442, 457 (1st Cir. 2020), (ii) whether there was a variance, *United States v. Dellosantos*, 649 F.3d 109, 116 (1st

Cir. 2011), (iii) whether the variance was prejudicial, *United States v. Burgos-Montes*, 786 F.3d 92, 113 (1st Cir. 2015), (iv) preserved claims of legal error in jury instructions, *McLellan*, 959 F.3d at 456, and (v) evidentiary rulings with respect to the district court's interpretation of the rules of evidence, *United States v. Dowdell*, 595 F.3d 50, 70 (1st Cir. 2010). Evidentiary rulings are otherwise reviewed for abuse of discretion, *id*, as are denials of motions to consider what are otherwise untimely motions to suppress. *United States v. Arias*, 848 F.3d 504, 513 (1st Cir. 2017).

## ARGUMENT

### I.   A Payment To A Victim Is Not A Bribe

Abdelaziz fully incorporates Section I of Wilson's brief regarding the government's novel theory that a payment to *a victim* can constitute a bribe. As the AUSA told the jury in closing, "Singer didn't tell the defendants that he was paying the insiders personally . . . . Singer told the defendant the money would go to USC. There's no dispute about that." A3653, A3671. Moreover, it is undisputed that: (1) Donna Heinel did not start taking any money personally until July 2018 (in other words, 9 months after Sabrina's provisional admission); and that (2)

previously all money directed to USC was for bona-fide USC purposes. A2990, A3213.

Both the honest services statute and § 666 require a "bribe" as that term has always been understood. *See Skilling*, 561 U.S. at 409-11 ("[H]onest-services fraud does not encompass conduct more wide ranging than the paradigmatic cases of bribes and kickbacks," "[it] criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." (emphasis in original)). In *Skilling*, the Supreme Court held in particular that "undisclosed self-dealing," meaning "the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty," does *not* constitute honest services fraud. *Id.* Outside of the "Varsity Blues" context, there is no precedent that a payment to a victim can be a bribe. *Cf. United States v. Thompson,* 484 F.3d 877, 884 (7th Cir. 2007) (Easterbrook, J.) (noting the absences of any appellate decision holding that an "increase in official salary, or a psychic benefit . . . is the sort of 'private gain' that makes an act criminal under § 1341 and § 1346"). Unauthorized fundraising is not a crime, or at least has not been until the government brought this case.

## II.  An Admissions "Offer" Is Not Property

Abdelaziz fully incorporates Section II of Wilson's brief arguing that an admissions "offer" where the buyer will pay full price is not property and, to the extent that such an offer *might* be considered property, the district court erred in instructing that such an offer *is* property in this case, A3827, without leaving that question to the jury.

Further, even if this Court rules in favor of Abdelaziz only on the first issue (bribery), the Court should nonetheless vacate the property fraud conviction because: (1) the discussion of bribery so infected the proceedings as to prevent Abdelaziz from receiving a fair trial on the property fraud issue; and (2) the district court permitted a blanket assertion of Fifth Amendment rights by two senior USC fundraisers who had nothing to do with Singer, presumably based on the government's expansive bribery theory, thereby depriving the defendants of the opportunity to examine these witnesses with respect to USC's admissions practices relevant to the property fraud charge. *See* A3315-29.

III.   There Was A Prejudicial Variance

   A. The Variance

Abdelaziz fully incorporates Section III of Wilson's brief regarding the variance and offers further argument as set forth below.

The government's charging decisions in this case were suspect from the beginning. For convenience and to overwhelm the defendants with prejudicial evidence of *other people's* guilt, the government charged a single, overarching conspiracy comprised of parents who: participated in the "side door" at universities across the country; arranged for their kids to cheat on standardized tests; arranged for Singer employees to take classes posing as their kids; and paid "true bribes" to the pockets of corrupt coaches. In response to the defendants' pre-trial motions to dismiss, the government insisted that whether they could prove the alleged conspiracy was a matter for trial. But when confronted *post-trial* with their failure of proof, the government referred back to the district court's *pre-trial* rulings, stating that the defendants were "merely regurgitat[ing] an argument the Court has rejected numerous times." ECF 2424 at 36. Of course, whether the allegations were sufficient to *permit a trial* and whether there was a variance *at trial* are two different

inquires.  But at the Rule 29 stage, the district court never addressed whether the conspiracy proven at trial was the conspiracy alleged in the indictment.  Nor did the district court evaluate the evidence as to each defendant.  *See* generally Wilson Add. 69 (denying Rule 29).

Specifically with respect to Abdelaziz, reading the record in the light most favorable to the verdict, the government proved—at most—a conspiracy among Singer, his employees, and Abdelaziz to facilitate his daughter's admission to USC through bribery and fraud.  Even if there was a nationwide conspiracy, there was no evidence that Abdelaziz agreed to join it.

The district court ignored the black letter law that "[t]he government must . . . produce evidence from which a jury could reasonably infer that **[each] defendant knew about and agreed to join any larger overarching conspiracy**." *United States v. Monserrate-Valentin*, 729 F.3d 31, 45 (1st Cir. 2013) (emphasis added) (quotations omitted). *See also United States v. Borelli*, 336 F.2d 376, 384-85 (2d Cir. 1964) (Friendly, J.) ("[T]he gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant . . . **and the scope of his**

agreement must be determined individually from what was proved as to him." (emphasis added)). "[E]ach individual must think the aspects of the venture interdependent, and **each defendant's state of mind**, and not his mere participation in some branch of the venture, is key." *Monserrate-Valentin*, 729 F.3d at 44 (emphasis added).

This Court must undertake the analysis that the district court did not. That is: what was the **evidence** of Abdelaziz's intent to join what the government described in opening as a "sprawling conspiracy that extended from coast to coast," A992, and in closing as "a sweeping conspiracy that involved dozens of others: Corrupt coaches and athletic department insiders, like Jovan Vavic and Donna Heinel at USC, Rudy Meredith at Yale, John Vandemoer at Stanford, Jorge Salcedo at UCLA, and Gordie Ernst at Georgetown"? A3638-39. *See United States v. Evans,* 970 F.2d 663, 674 (10th Cir. 1992) ("The best way to assess a defendant's intended involvement in a conspiracy is to examine the conspiracy from that defendant's point of view. What exactly did [the defendant] think she was joining? To answer this question, we need look only to common sense and to the facts of this case.").

The answer is none.  This was the rarest of criminal prosecutions in which there were **zero** witnesses who had ever spoken to the defendant. Proof of Abdelaziz's intent (to say nothing of his knowledge of the overarching conspiracy) relied entirely on documents and two "consensual wiretap" calls.  At most, the documents and two calls showed that: (1) Abdelaziz agreed with Singer to have Sabrina admitted through the "side door" at USC; and (2) one year after Sabrina was admitted, and already attending USC, Singer called Abdelaziz and implied he had done many "side doors" at USC and the "format" he used for Sabrina's profile would be used for subsequent "side doors."  That is the only evidence in the entire case about Abdelaziz's intent to join the overarching conspiracy.  Therefore, even assuming that the multi-objective, nationwide conspiracy actually existed, there was no evidence that Abdelaziz agreed to join it.

Of course, it is not impossible for the government to show that a criminal defendant knew of and agreed to participate in an overarching conspiracy.  The government **could have** called Singer to testify regarding Abdelaziz's agreement to join the overarching conspiracy (presumably Singer could not do so because Abdelaziz made no such agreement).

Usually, it is the main cooperator who presents evidence of the defendant's agreement (even if implicit) to join a conspiracy through observations of the defendant's words and actions. But this is the extraordinary case in which the government decided not to call their main cooperator or any person who ever had any conversation with Abdelaziz. Instead, the government called Bruce Isackson—an alleged co-conspirator Abdelaziz never heard of (and who had never heard of Abdelaziz)—to explain *Isackson's* understanding of the overarching conspiracy and *Isackson's* understanding of interdependence. Then the government argued in closing:

> You know from the evidence that these defendants joined in **that scheme** and **that conspiracy** knowingly and intentionally . . . that the defendants knew what they were doing and that they intended to do it, and that they knew that what they were doing is wrong . . . . One way you know that is because **Bruce Isackson told you** that he knew it, from the witness stand.

A3645 (emphasis added). *See also* A3677 (prosecutor reminding jury how Singer described the conspiracy to Gordon Caplan and Augustin Huneeus, other parents whom Abdelaziz had never heard of).

But what does Isackson's understanding of a conspiracy *he* joined have to do with Abdelaziz's understanding? Surely the jury is not

permitted to infer that simply because *other people* agreed to join the conspiracy alleged in the indictment, the defendant also agreed to join the same conspiracy. *See United States v. Richardson*, 225 F.3d 46, 53 (1st Cir. 2000) ("[M]embership in the conspiracy [must] be proved on the basis of [one's] own words and actions (not on the basis of mere association or knowledge of wrongdoing)." (citation omitted)); *Ingram v. United States*, 360 U.S. 672, 680 (1959) ("[C]harges of conspiracy are not to be made out by piling inference upon inference[.]"). It is *Abdelaziz's* understanding of the agreement that is the correct inquiry. *See Franco-Santiago*, 681 F.3d at 8-10 (describing issues where there is an "undue focus on the *group* rather than on what the *agreement* was" (emphasis added)), *abrogated on other grounds*.

The prosecutor also argued in closing that the parents, including Abdelaziz, must have known there was a larger conspiracy because "that is the reason that Rick Singer was able to offer his clients a network of different schools, all those different options, UCLA, USC, Georgetown with Gordie Ernst, Yale with Rudy Meredith." A3577. But there was zero evidence that Abdelaziz—as opposed to other alleged co-conspirators—knew the "side door" program extended anywhere beyond

USC.  And even if the government had shown that knowledge, mere knowledge that the "hub" figure is involved in parallel activity is not enough to show that the defendant agreed to advance such activities.  *See Glenn,* 828 F.2d at 859 (Breyer, J.) (evidence "show[ed] at most that [defendant] knew about the [parallel] venture; it does not show that he agreed to take, intended to take or actually took any action that he knew would likely further that [venture]").

In short, "the government is hoisted with its own petard.  Having chosen to allege that [Abdelaziz] joined a single large conspiracy, that is what the government obligated itself to prove.  It failed in that regard." *See Evans*, 970 F.2d at 674.  There was "a total absence of evidence that [Abdelaziz] intended to join such a conspiracy as alleged." *Id.*[10]

---

[10] Compounding the variance was an instructional error. The district court's instructions permitted the jury to convict Abdelaziz of joining a smaller conspiracy than that alleged in the indictment.  The district court described Count I as a "scheme and artifice to defraud and obtain money and property, to wit admission to the (University of Southern California), by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive (USC)  of (its) right to the honest and faithful services of (its) athletic coaches and university administrators, through bribes and kickbacks."  A3820.   Counsel promptly objected to this description of the conspiracy, which is inconsistent with the overarching, nationwide, multi-object conspiracy alleged in the indictment.  A3869.   Nevertheless, the district court declined to correct the instruction, which left the jury with the incorrect

## B. Prejudicial Spillover

Abdelaziz fully incorporates Section III. B. of Wilson's brief regarding the prejudicial effect of the variance. Wilson's arguments regarding prejudice are equally applicable to Abdelaziz. Abdelaziz was not aware of anything but the "side door," did not know that the "side door" was broader than USC, and never knew money would be directed to coaches' pockets. Facing substantial evidence of other co-conspirators' bad faith, there simply was no way that Abdelaziz's *good faith* could have resonated with the jury. And for the same reasons that Wilson was prejudiced by joinder with Abdelaziz, Abdelaziz was prejudiced by joinder with Wilson. Abdelaziz was prejudiced by Wilson's facts, including the write-off that led to the separate tax charges.

## C. Venue

The variance also prejudiced Abdelaziz because without a single conspiracy, venue in the District of Massachusetts is improper for the charges against him. When there is a variance between the indicted conspiracy and the proven conspiracy, the court must determine whether

---

understanding that they could convict Abdelaziz on Count I even if he only joined a conspiracy to defraud USC.

there was venue for the *proven* conspiracy.  *See Glenn*, 828 F.2d at 860 (Breyer, J.) (vacating conviction).  Aside from the single nationwide conspiracy,[11]  the district court found that venue was proper in Massachusetts because: "Singer called Abdelaziz while in Boston" and "Singer called Heinel while in Boston."  Wilson Add. 76.  Both findings were wrong.

### i.  Singer Calls To Abdelaziz

The recorded calls to Abdelaziz took place on October 25, 2018 and January 3, 2019: several months *after* Sabrina started attending USC, seven months *after* Abdelaziz made his payment, and over a year *after* Sabrina was provisionally admitted to USC.  Any conspiracy between Singer and Abdelaziz to fraudulently obtain Sabrina's admission to USC was completed by that point, so the calls could not possibly have been made in furtherance of the conspiracy.  The government admitted as much.  During the misconduct briefing, the government referred to these calls as "audit calls," and noted that they "concern historical conduct" and were not "targeting ongoing and future conduct," but were made to

---

[11] Of course, venue for Count 2 could be proven from only a smaller set of facts, as Count 2 was related solely to USC (the "USC Federal Programs Bribery Conspiracy").

parents "who had already engaged in the scheme." A374-77. The sworn declarations of the federal agents and AUSA are even more direct. *See* A383 (IRS Agent describing calls to "parents who had completed the fraud and bribery scheme"); A387 (same for FBI Agent); A390 (AUSA describing "parents who had already completed the scheme before Singer began cooperating").

Given these government concessions in the misconduct briefing (which preclude contrary arguments now), the Court need go no further. But even if the conspiracy was ongoing, Abdelaziz—as opposed to Singer—did not use the call to "further[] a conspiratorial goal." *United States v. Rommy,* 506 F.3d 108, 122 (2d Cir. 2007). *See also United States v. Ciresi*, 697 F.3d 19, 28 (1st Cir. 2012) ("narratives of past events" are not "in furtherance"). And any argument that the calls furthered a cover-up runs head-long into *Grunewald v. United States*, 353 U.S. 391, 401-02 (1957) ("[A]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.").

### ii. Singer Call To Heinel

The Singer call to Heinel (A4638), which the government identified in its Rule 29 Opposition as taking place on October 5, 2019, also fails to establish venue. The call is slightly under two minutes and thirty seconds and the discussion relates exclusively to "Isabella" and "Claire" being admitted to USC as volleyball players. A4638-41. Again, there is no indication that this call was part of Singer's conspiracy with Abdelaziz. If the scope of Abdelaziz's conspiratorial agreement was to fraudulently obtain Sabrina's admission to USC, that conspiracy ended once its goal (Sabrina's admission to USC) was accomplished. Sabrina was already a student at USC when this call took place and had been provisionally admitted one year prior. There was no evidence that Abdelaziz had any interest in the admission of Isabella or Claire at any point in time, much less a year after Sabrina's admission. And again, to the extent the call proves a cover-up to conceal a broader scheme, *Grunewald* is fatal.

The October 5, 2018 call also suffers from a more fundamental problem: there is insufficient evidence that Singer made the call from Boston. Although Singer **says** that he is "in Boston" and "jump[ing] on a

plane coming back," his statement is not evidence because it constitutes "testimonial hearsay of an absent declarant proscribed by the Confrontation Clause." ECF 2298 at 3. These statements were admitted "not for their truth but only to provide context for statements made by a party or other conspirators in the conversation." *Id.* at 4.[12]

### iii. Check

Grasping at straws, the government has suggested that a bank check (A4813-17) Singer allegedly procured in Boston and sent to Heinel from an unknown location on January 3, 2019 establishes venue. ECF 2424 at 39. But again, the Abdelaziz-Singer conspiracy had achieved its objective and concluded by this time. Sabrina was provisionally admitted to USC over a year prior. And personal payments to Heinel were in furtherance of a separate agreement with Heinel which the government admitted was not contemplated by Abdelaziz's agreement with Singer: the Singer-Heinel "side deal" that did not even exist until *after* Sabrina

---

[12] After the jury charge, defense counsel objected to the district court's "failure to remind the jury that Singer's testimonial statements cannot be used as evidence, including evidence of venue when he says 'I am in Boston.'" A3851. The district court declined to correct the instruction. In fact, despite the defendants' lengthy objections the district court did not make a single clarification or correction before sending the jury to deliberate. *See* A3870-72.

was admitted to USC.  *See supra,* Statement of the Case, Section C.  This is not a case where the defendant did not know one way or the other about the details of the conspiracy.  As the government admits, Abdelaziz was affirmatively told by Singer, and understood, that his payments were for USC.

In any case, the government's argument ignores the basic principle that only a **co-conspirator's** action in furtherance of a conspiracy can create venue.  *See United States v. Georgiadis*, 819 F.3d 4, 10 (1st Cir. 2016) ("[I]f [defendant] or **any of his co-conspirators** took an over act in furtherance of the conspiracy . . . in Massachusetts, then venue [there] was proper." (emphasis added)).  The government invited the district court to hold that a government agent procuring a check in Massachusetts and then sending it (from an unknown location) to an alleged co-conspirator (in an unknown location) is enough to establish venue.  But Singer—as a government agent—was incapable of taking any action in furtherance of the conspiracy.  Of course Singer could help generate *evidence* of a conspiracy's existence, or cajole others into taking actions, *United States v. King,* 272 F.3d 366, 371 (6th Cir. 2001), but Singer's unilateral acts, like obtaining a check, are insufficient.

Nor does the evidence connect the check to Massachusetts. There was no testimony on this issue. The only alleged Massachusetts connection is the phrase "Seaport Square" in the upper-left corner. Never mind that the lower-left corner states, "San Antonio, Texas"—the government apparently believes the jury could infer that the upper-left reflects the branch where the check was obtained and that "Seaport Square" is located in Massachusetts (although the check does not specify). The Sixth Amendment's guarantee of an "impartial jury of the state and district wherein the crime shall have been committed" should not be based on guesswork.

## IV. The District Court Erroneously Excluded Critical Defense Evidence

### A. USC Evidence

Abdelaziz fully incorporates Section IV. A. of Wilson's brief regarding the exclusion of USC evidence and its relevance. In addition, there is yet another basis on which the district court should have found the USC evidence relevant. That is: the evidence was relevant to Abdelaziz's good faith defense and the absence of specific intent. Both conspiracy counts required proof that Abdelaziz acted with specific intent. *See United States v. Piper*, 35 F.3d 611, 615 (1st Cir. 1994)

(conspiracy); *United States v. Sawyer*, 85 F.3d 713, 723 (1st Cir. 1996) (fraud); *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013) (federal-programs bribery). And with respect to both counts, good faith is a complete defense. *See United States v. Gorski*, 880 F.3d 27, 32 n.3 (1st Cir. 2018); *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991) (good faith is an "absolute defense" to a specific-intent crime).

Abdelaziz's primary defense was that he did not have specific intent to defraud USC and acted with good faith. It was a standard part of Singer's pitch to tell parents that colleges gave preferential admissions treatment for practice players and team managers, even those who were not good enough to compete at the Division 1 level. *See* A1153-56, A1169-70, A1710-12, A2416-19, A4890-91 (testimonials on The Key's website thanking Singer for helping them obtain team manager positions). *See also* SA115-16 (█████████████████████████████████████ ██████████████████████████████████████). Abdelaziz acted accordingly, with the belief that he was doing what USC wanted. If Abdelaziz's belief was genuine, then Abdelaziz should have been found not guilty on all counts.

Obviously a belief is more likely to be genuine if that belief is reasonable. And therefore evidence of the *reasonableness* of a defendant's belief is highly probative of intent. The Supreme Court recognized this common-sense theory of relevance in *Cheek v. United States*, 498 U.S. 192, 203-04 (1991), noting that "[o]f course, the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple [disregard for] known legal duties . . . ." Shortly following *Cheek*, the Eleventh Circuit considered the exclusion of expert testimony on the reasonableness of the defendant's belief that a $1,500 check was a gift rather than taxable income. Vacating the conviction, the Court ruled that:

> It is thus highly probative for the defense to show that the defendant's belief—whether or not mistaken—was reasonable; evidence of a belief's reasonableness tends to negate a finding of willfulness and to support a finding that the defendant's belief was held in good faith.

*United States v. Lankford*, 955 F.2d 1545, 1550–51 (11th Cir. 1992). Convictions were also vacated in *United States v. Onumonu*, 967 F.2d 782 (2d Cir. 1992) and *United States v. Diallo*, 40 F.3d 32 (2d Cir. 1994), cases where the defendants argued they thought they were smuggling

precious metals or diamonds—rather than drugs—and the district court excluded evidence of whether it was reasonable or cost-effective to smuggle metals and diamonds in the manner described in those cases. *See Onumonu*, 967 F.2d at 787 ("In the context of this case, that testimony certainly met the relevancy standard of rule 401 because it made the existence of [defendant's] belief about [the scheme] more probable than it would have been without the evidence.").

In the same way, the USC evidence is relevant to Abdelaziz's intent because it shows the reasonableness of his good faith belief that USC exchanged donations for admission. Judge Kelley agreed with this argument in denying USC's motion to quash the defendants' Rule 17(c) subpoenas. Judge Kelley found that evidence regarding USC's admissions practices was relevant to the defendants' intent:



SA137.



SA115-16.



SA176.

Judge Kelley's sound reasoning was ignored by the district court, which ruled that if "such alleged conduct was not known to the subject defendant, it is **irrelevant** and thus inadmissible."   A568 (emphasis added).  That misses the point entirely.  The USC evidence is not relevant because Abdelaziz knew of it, but because it shows the reasonableness of him believing USC exchanged money for athletic admissions, regardless

46

of whether he was aware of the specific evidence at issue. *See United States v. Litvak,* 808 F.3d 160, 190 (2d Cir. 2015) (abuse of discretion to exclude evidence that supervisors "regularly approved of conduct identical to that with which" defendant was charged, even though defendant did not have knowledge of such approvals).

### B. Hearsay

As set forth below, the district court made at least two major hearsay errors which severely prejudiced Abdelaziz.

1. Exhibits 1540, 1254, and 1255 are described *supra* at Statement of the Case, Section C. These exhibits demonstrate that Singer and his employee Mikaela Sanford used the false profile to complete Sabrina's USC application and did so without Abdelaziz's knowledge, intentionally hiding from him what they were doing. The district court sustained the government's hearsay objections to all three emails during the cross-examination of Sanford on September 20, 2021, stating "I don't see how this is admissible." A1746.

The following day, defense counsel attempted to use these exhibits again on cross-examination with another witness, and again the government's objection was sustained. A2208-10. Counsel then filed a

motion to admit the exhibits. ECF 2247. Despite clear legal precedent to the contrary, the prosecutors continued to insist that Exhibits 1540, 1254, and 1255 were inadmissible hearsay. ECF 2257. In a written order (ECF 2270), the district court denied the motion, stating that the emails were:

> [P]ure hearsay because, they are in fact, offered for the truth of the matters asserted, specifically that Sanford requested and received Sabrina's athletic profile from Singer prior to Sanford's submission of her application to USC, and that Sanford intended to update Sabrina's application with the information provided by Singer.

But the first two emails contained no assertions. *See* A4881 (Ex. 1540 is a request: Sanford asking Singer to "Please send Profile for Sabrina Aziz" with no other text in the email); A4850 (Ex. 1254 contains no text, it simply shows Singer sending Sanford the profile, which was already in evidence as Exhibit 351). Further, the "intent" holding is directly contrary to Supreme Court precedent—130 years old—that a statement of present intention is admissible to prove the declarant acted according to that intention. *See Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285 (1892); *see* A4853 (Ex. 1255 (stating only "Thanks. Will update her app and submit.").

Faced with a clear misapplication of the hearsay rules, and prosecutors eager to take advantage of that misapplication, defense counsel took the extraordinary step of writing to the United States Attorney requesting that the objections be withdrawn and noting that the "win-at-all-costs approach is not only inappropriate for federal prosecutors but has the effect of denying Defendant Abdelaziz his constitutional right to a fair trial and constitutes a violation of MA Rule of Professional Conduct 3.3 (candor toward the tribunal)." ECF 2289-1. Finally, on September 28, 2021, the government withdrew its objections to Exhibits 1540, 1254, and 1255, *see* ECF 2297, and the exhibits were admitted on the first day of the defendants' case in chief, September 30, 2021, A3190.

But by that point the damage was done. Introducing the exhibits ten days after the relevant witness testified severely prejudiced Abdelaziz. Cross-examination may be the "greatest legal engine ever invented for the discovery of truth," *California v. Green*, 399 U.S. 149, 158 (1970) (citation omitted), but is useless if the defendant cannot cross-examine the witness on relevant, admissible evidence. Moreover, the evidence was critical to Abdelaziz's defense that he was unaware of the

false credentials. Why did Sanford intentionally exclude Abdelaziz from the email communication about the profile if Abdelaziz was "in on" the fraud? Certainly Sanford did not think Abdelaziz knew about the false credentials. The district court's exclusion of this crucial defense evidence affected Abdelaziz's substantial right to present a defense. By excluding the evidence during cross-examination of a critical government witness, Abdelaziz was prohibited from conveying his theory of the case to the jury in real time and was unable to confront Sanford, who testified contrary to the excluded documents. *See supra*, Statement of the Case, Section C.

2. On multiple occasions, the defendants attempted to introduce Exhibit 1288 (A4854-55), a "chat" between Alexander Alvendia (a USC admissions officer responsible for Sabrina's school) and Kelsey Bradshaw (a USC admissions officer on SubCo), transcribed here:

| | |
|---|---|
| Alvendia: | 3208-3732-29 Name Abdelaziz, Sabrina |
| Bradshaw: | athlete |
| Alvendia: | Yea what's her deal? |
| Bradshaw: | she's admitted |
| Alvendia: | Do you have an background? |
| Bradshaw: | haha |
| Alvendia: | lol |
| | Is she *actually* a bball player?? |
| Bradshaw: | shes supposedly the best bball player in the Asian international school league? |
| Alvendia: | Ha ok good to know |
| Bradshaw: | lol |

| | |
|---|---|
| Alvendia: | Thanks! |
| Bradshaw: | but yes, it appears she actually plays the sport! |
| Alvendia: | HA |
| Bradshaw: | that has been a problem this year |
| Alvendia: | Good to know, the counselor reached out and was like um... What's up with this admit |
| Bradshaw: | LOL |
| Alvendia: | This school sends us like 60 and she's near the bottom |
| | This is a top feeder for us abroad so I was like um..... Athlete??? I hope this isn't a surprise! |
| Bradshaw: | lol, ooohhh athletes... |
| Alvendia: | right? |
| | keep doing the lord's work, kelsey |
| Bradshaw: | (headbang) |

The exhibit was introduced to show that USC admissions officers joked about whether Sabrina played basketball. Counsel intended to ask the jury to infer that USC knew that some students did not play the sports for which they were recruited and that USC did not care.

The government objected on hearsay grounds and the district court sustained the objection. A1893-94. When defense counsel argued that the exhibit was not hearsay because it was not offered for the truth, the district court stated: "If that isn't for the truth of the matter, I don't know what is . . . . This is not offered not for the truth. It's offered for the defendants' case that the admissions department at the University of Southern Cal wanted to take money for spots." A1963. Thereafter, the

district court repeatedly denied counsel's motions for reconsideration to admit Exhibit 1288 under various theories of admissibility. *See* ECF 2468.

Exhibit 1288 is not hearsay. But as with Exhibits 1540, 1254, and 1255, the government sought to take advantage of the district court's misapplication of the rules.[13] There are only six statements capable of being hearsay in Exhibit 1288, none of which mattered.[14] *Counsel's* assertions about the implications of the document do not involve the hearsay rules. The district court misapplied the basic principle that hearsay is not about the assertions of litigants—it is about the assertions of declarants. *See* 30 Fed. Prac. & Proc. Evid. § 6572 (2d ed.) ("The

---

[13] At one point in the proceedings, the government created a new hearsay objection which does not appear in the rules of evidence: "It's hearsay as to this witness." The district court sustained the objection. A2583-84.

[14] Abdelaziz admitted Sabrina only played basketball for two years and was not the best player in the league; it was irrelevant that Sabrina's counselor reached out, or that her school was a "feeder" school; it was bad for Abdelaziz that Sabrina was at the bottom of her class, and Chassin had already testified about the "problem" of students not playing sports for which they were admitted. Counsel offered, "If the government or the Court are concerned that a limiting instruction is necessary so that the jury does not consider Exhibit 1288 for any of these six points, Defendants have no objection." ECF 2275 at 3.

declarant's intended assertions should not be confused with what the proponent is trying to prove. One turns on the declarant's intention to communicate and the other on the proposition that the proponent (the lawyer) is using the statement to prove."). But instead of arguing the **weight** of the evidence, the government lodged a baseless hearsay objection they knew the district court would sustain.[15]

Unlike Exhibits 1540, 1254, and 1255, the government never withdrew its objection and Exhibit 1288 was never admitted. Abdelaziz was severely prejudiced because Exhibit 1288 went to the very heart of one of Abdelaziz's defenses: USC knew donations were being exchanged for admissions and did not care. Exhibit 1288—as well as the other evidence cited in the Wilson brief at Section IV. A., which the district court excluded solely on relevance grounds—would have helped show the jury that there was no fraud or bribery. *See supra*, IV. A. *See also* SA115

---

[15] Convincing the district court to misapply the hearsay rules was not a government mistake; it was a government tactic. *See United States v. Hayes*, 40 F.3d 362, 367 (11th Cir. 1994) ("As is not unusual when counsel have persuaded a trial judge to err—asserting, of course, that a contrary ruling would have been devastating—the Government now agrees that it counseled the judge to err, but argues that the error was really harmless and did not prejudice [defendant's] ability to present his defense. We look at such a series of events with something less than enthusiasm.").

(████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████).

### C. Singer Evidence

Abdelaziz fully incorporates Section IV. B. of Wilson's brief regarding the exclusion of good faith evidence related to Singer's "pitch." As explained therein, the district court permitted the government to weaponize the rules of evidence, introducing mounds of evidence showing Singer's nefarious description of the "side door" to certain parents—all admitted as co-conspirator statements—while simultaneously preventing the jury from considering mounds of evidence showing the non-nefarious manner in which Singer described the side door to many other parents. The relevance of this evidence was succinctly articulated by Judge Kelley:



SA113 (emphasis added).

## V. The "Consensual Wiretap" Recordings Should Have Been Suppressed

The government's "consensual wiretap" in this case was contrary to the unambiguous language of Title III and therefore the recordings should have been suppressed.

### A. Background

On October 2, 2018, the government told the district court (Burroughs, J.), which had authorized a Title III wiretap of Singer's phone, that:

> The monitoring of TARGET TELEPHONE 1 began on August 30, 2018 and ceased at midnight of September 27, 2018. The government's investigation of this matter continues in that SINGER is now cooperating with investigators and he is placing consensual calls to various target subjects.

A3899-3900. But that was not true. Singer was not simply "placing consensual calls," which means making calls on a government phone or using a recording device/software. And the recordings were not limited to "various target subjects." Instead, with AT&T's technical assistance,

the government instituted a so-called "consensual wiretap"—the technical equivalent of a traditional wiretap—that recorded all incoming and outgoing calls from Singer's phone (with no minimization or court supervision) for an additional five months.

AT&T agreed to provide such assistance after receiving a September 20, 2018 letter from former AUSA Eric Rosen that represented Singer consented to a wiretap of his 8802 phone.[16] A361-62. In reality, the "consent" executed by Singer (dated seven days *after* the letter) permitted monitoring of any phone "provided to [Singer] or made available to [Singer] by law enforcement." *Id.* The government did not tell AT&T that the 8802 phone was actually Singer's *personal phone* and was *not* provided to him by law enforcement. *Id.* As a result, there was no written consent for monitoring of the 8802 phone. The FBI *did* provide Singer with a phone to call agents and prosecutors, but that phone was intentionally unmonitored so as not to create a record of additional *Brady* or *Jencks* material. *See* A326. In other words, the phone for which there

---

[16] The forms provided to AT&T listed the "Judge's Name" as "AUSA Eric Rosen." ECF 2412-1; A4193.

*was* consent (the FBI phone) was *unmonitored*, and the phone for which there was *not* consent (Singer's personal 8802 phone) was *monitored*.

### B. Section 2511(2)(a)(ii)

"[I]n a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception—not the rule." *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir. 1987). Regardless of whether Singer provided valid consent, the government's implementation of a "consensual wiretap" through a service provider's technical assistance violated the law. There is only one provision in the United States Code that permits a service provider like AT&T to provide technical assistance to law enforcement in intercepting phone calls. The provision states:

> Notwithstanding any other law, providers of wire or electronic communication service, their officers, employees, and agents . . . are authorized to provide information, facilities or technical assistance to persons authorized by law enforcement to intercept wire, oral, or telephonic communications . . . . If such provider, its officers, employees, or agents . . . has been provided with (A) a court order directing such assistance . . . or (B) a certification [of an "emergency situation"].

18 U.S.C. § 2511(2)(a)(ii). According to the unambiguous language of the statute, AT&T cannot provide technical assistance in intercepting

telephonic communications without either: (1) a court order; or (2) a certification of an "emergency situation."[17]  The law does not provide a third option where an AUSA can self-authorize a wiretap by writing a letter to AT&T and assuring them that he has someone's consent to wiretap his or her phone.

There is good reason to require a court order for "consensual wiretaps," which are the technical equivalent to traditional Title III wiretaps.  There is an enormous difference between run-of-the-mill consensual recordings and wiretaps.[18]  With consensual recordings, the recording is limited by either the government or the informant recording

---

[17] *See also* H.R. Rep. No. 95-1283 at 99 (1978) ("Where a court order is required to initiate surveillance, a copy of the order must be provided to the party providing assistance.  Where a court order is not required, a copy of the relevant Attorney General certificate must be provided.").  There is no third option.  *See id.* ("Requiring the court order or certification to be presented before the assistance is rendered . . . places an additional obstacle in the path of unauthorized surveillance activity . . . .").

[18] There is no dispute that 18 U.S.C. § 2511(2)(c)-(d) govern such run-of-the-mill consensual recordings (which are confusingly sometimes referred to as "consensual wiretaps").  But those provisions do not affect the *separate* requirement of a court order under section 2511(2)(a)(ii) to permit AT&T to perform its distinct role in providing "*technical assistance*" to the "*persons authorized by law*" to intercept (i.e. record) calls.

each call. The recordings will not capture conversations between the informant and individuals who are not targets of the investigation, such as spouses, physicians, etc. And the informant can—in effect—revoke consent at any time because he can simply stop recording or stop cooperating.

When law enforcement has technical assistance, however, the phone company provides *all calls* to law enforcement with no informant interaction. In Singer's case, this meant electronic surveillance was ongoing for nearly five months after the last court order expired, capturing *every single call* going in and out of Singer's phone, including calls of a personal nature that had nothing to do with this case. Unlike traditional wiretaps, there were no "minimization" procedures. *See United States v. Lopez*, 300 F.3d 46, 57 (1st Cir. 2002) ("The minimization requirement spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and *those who, often innocently, come into contact with such suspects.*" (emphasis added) (quotations omitted)). The "consensual wiretap" here was a true "dragnet, sweeping in all conversations within its scope—without regard

to the participants or the nature of the conversations." *Berger v. New York*, 388 U.S. 41, 65 (1967) (Douglas, J. concurring). And the wiretap was apparently never-ending, because AT&T was not provided with an order setting forth "the period of time during which the provision of the information, facilities, or technical assistance is authorized" as required by 18 U.S.C. § 2511(2)(a)(ii).

It is easy to see why Congress demanded that providers render technical assistance only upon court order and not simply on an AUSA's "say so." What would prevent a federal agent from enlisting the technical assistance of a provider to set up a wire, representing that he has legal authority (such as consent) when he does not? With no court to provide a "check," the danger begins once the agent sends his letter and the phone company begins surreptitiously surveilling citizens without justification. If no court order is needed for technical assistance, the possibilities for abuse are endless. Indeed, one such abuse occurred in this case! The cover letter stated that Singer gave consent for the 8802 phone, while the consent form (dated seven days later) provided consent for a *different* phone.

The requirements for judicial authorization of a "consensual wiretap" are not particularly onerous. If Singer provided valid consent, the government did not have to follow the 18 U.S.C. § 2518 process. *See In re Application of United States.*, 128 F. Supp. 3d 478, 482 n.4 (D.P.R. 2015) ("Notably, while § 2511(2)(a)(ii) authorizes providers to furnish assistance upon a court order, it does not explicitly state that the order be one pursuant to § 2518."). Indeed, "court orders under § 2511(2)(a)(ii) are distinct from interception orders pursuant to § 2518, which must include additional information . . . ." *Id.* at 482. But some court order was required, and here the government simply did not obtain one.

## C. Suppression

The government's failure to obtain an order authorizing technical assistance as required by § 2511(2)(a)(ii) failed to satisfy a statutory requirement that "directly and substantially implement[ed] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974). And this failure was not an "isolated flaw," but a critical violation that upset the balance struck by Congress and frustrated Title III's

statutory purpose of protecting privacy. *See Lopez*, 300 F.3d at 56. This is not a case in which an application for a court order violated Title III in some technical yet ultimately tolerable sense. *See id.* (wiretap application did not disclose civilian monitors). Rather, there was *no* application at all and *no* order at all. Because the government's actions have critical implications for privacy regardless of the informant's consent, Title III's purposes cannot be achieved if this violation is tolerated. *See supra*, V. B. And it goes without saying that the district court's failure to suppress the recordings severely prejudiced Abdelaziz, as the recordings constituted what the government believed to be its best evidence in this case.

## D. Timeliness

The district court abused its discretion in finding that Abdelaziz failed to show good cause for his delay in moving to suppress. Although the deadline for pre-trial motions was April 1, 2020, just one month before trial, the government moved to authenticate the recordings and attached an affidavit from an FBI Telecommunications Intercept Supervisory Agent. *See* ECF 2099-1. The affidavit disclosed that AT&T provided technical assistance in operating a continuous, uninterrupted

wiretap from June 5, 2018 to March 14, 2019. Abdelaziz moved to suppress the recordings less than two weeks later. ECF 2128. Without the affidavit, Abdelaziz could not have brought the motion because it was the technical assistance disclosed in the affidavit that violated the statute.

Notably, the defendants in a companion case before Judge Talwani filed a motion to suppress the same recordings. Judge Talwani found there was good cause for the delay because "the government[] . . . never [before] suggest[ed] that the referenced 'consensual recordings' were facilitated by AT&T. Where the government did not provide this information to Defendants, Defendants first learned of this information from the government[] [on] August 17, 2021 . . . ." Order, ECF 939 at 4-5, *United States v. Ernst*, No. 19-cr-10081-IT (D. Mass. Oct. 25, 2021). Judge Talwani's holding was correct. Judge Gorton abused his discretion in his contrary finding, which consisted of a single sentence stating that no good cause was shown. *See* ECF 2211 at 3. The district court's failure to consider the wiretap issue severely prejudiced Abdelaziz. Had the district court considered the issue and analyzed it correctly, the government's most important evidence would have been suppressed.

This Court should now decide the pure question of law raised by Abdelaziz. It should do so according to the plain statutory text in order to safeguard the privacy concerns at the core of Title III.

## CONCLUSION

For the foregoing reasons, the Court should enter a judgment of acquittal on both counts, or at a minimum, grant Abdelaziz a new trial on both counts. If the Court reverses the conviction of Count 2 only, Abdelaziz respectfully requests the Court remand for resentencing.

Dated: April 25, 2022

Respectfully submitted,

/s/ *Brian T. Kelly*
Brian T. Kelly
Joshua C. Sharp
Lauren A. Maynard
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

*Counsel for Defendant-Appellant*
*Gamal Abdelaziz*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the length limitations set by this Court's Order of April 7, 2022. The brief contains 12,913 words, excluding the items exempted by Fed. R. App. P. 32(f).

2.    This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Office Word 2016 in 14-point, proportionally spaced Century font.


Dated: April 25, 2022                    */s/ Brian T. Kelly*
                                            Brian T. Kelly
                                            *Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I certify that on April 25, 2022, I filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit via hand delivery. Counsel for the United States will be served via FedEx.


Dated: April 25, 2022

/s/ Brian T. Kelly
Brian T. Kelly
*Counsel for Defendant-Appellant*

# ADDENDUM

# TABLE OF CONTENTS

| ECF NO. | DESCRIPTION | DATE FILED | PAGE |
|---------|-------------|------------|------|
| 2532 | Judgment of Gamal Abdelaziz | 2/16/2022 | Add. 1 |
| 2539 | Amended Judgement of Gamal Abdelaziz | 2/23/2022 | Add. 9 |

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| GAMAL ABDELAZIZ | Case Number: **1: 19 CR 10080 - 4 - NMG** |
| | USM Number: 55400-048 |
| | Brian T. Kelly, Esq. |
| | Defendant's Attorney |

### THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)   1ss, 2ss
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C.§§1349, 1341, 1343, and 1346 | Conspiracy to Commit Mail and Wire Fraud and Honest Services Mail and Wire Fraud | 02/28/19 | 1ss |
| 18 U.S.C. § 371 | Conspiracy to Commit Federal Programs Bribery | 02/28/19 | 2ss |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____  ☐ is  ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/9/2022
Date of Imposition of Judgment

*[signature]*
Signature of Judge

The Honorable Nathaniel M. Gorton
U.S. District Judge
Name and Title of Judge

02/16/2022
Date

AO 245B (Rev. 11/16)  Judgment in Criminal Case
　　　　　　　　Sheet 2 — Imprisonment

Judgment — Page __2__ of __8__

DEFENDANT: GAMAL ABDELAZIZ
CASE NUMBER:  1: 19 CR 10080  - 4   - NMG

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:   12   month(s)

and 1 day.
This term consists of terms of 12 months and 1 day on Counts 1ss and 2ss, such terms to be served concurrently.

☐  The court makes the following recommendations to the Bureau of Prisons:

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

　　☐  at  _____  ☐ a.m.  ☐ p.m.  on  _____.

　　☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

　　☐  before 2 p.m. on  _____.

　　☐  as notified by the United States Marshal.

　　☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

Add. 2

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

|  |  | Judgment—Page | 3 | of | 8 |

DEFENDANT: GAMAL ABDELAZIZ
CASE NUMBER: 1: 19 CR 10080  - 4   - NMG

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :    2    year(s)

This term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
               Sheet 3A — Supervised Release

|  |  |  |  |  |
|---|---|---|---|---|
| Judgment—Page | | 4 | of | 8 |

DEFENDANT:  GAMAL ABDELAZIZ
CASE NUMBER:   1: 19 CR 10080  - 4   - NMG

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature       _____     Date    _____

AO 245B(Rev. 11/16)    Judgment in a Criminal Case
                       Sheet 3D — Supervised Release

Judgment—Page    5    of    8

DEFENDANT: GAMAL ABDELAZIZ
CASE NUMBER: 1: 19 CR 10080  - 4   - NMG

## SPECIAL CONDITIONS OF SUPERVISION

1. You must complete 400 hours of community service at an agency approved by the Probation Office.
2. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.
3. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.
4. You must provide the Probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the U.S. Attorney's Office.

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
              Sheet 5 — Criminal Monetary Penalties

Judgment — Page    6    of    8

DEFENDANT: GAMAL ABDELAZIZ
CASE NUMBER:   1: 19 CR 10080  - 4  - NMG

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ 250,000.00 | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $          0.00 | $          0.00 |  |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Add. 6

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
        Sheet 5A — Criminal Monetary Penalties

| | Judgment—Page | 7 | of | 8 |
|---|---|---|---|---|

DEFENDANT:  GAMAL ABDELAZIZ
CASE NUMBER:   1: 19 CR 10080  - 4   - NMG

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

It is further ordered that the defendant shall pay to the United States a fine of $250,000.
This consists of $125,000 on each count.
It is further ordered that the defendant shall make a lump sum payment of $250,000 which is due within 60 days of sentencing.

Any fine imposed is to be continued to be paid until the full amount, including any interest required by law, is paid. All fine payments shall be made to the Clerk, U.S. District Court. The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the fine remains unpaid.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT:  GAMAL ABDELAZIZ
CASE NUMBER:   1: 19 CR 10080   - 4   - NMG

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___200.00___ due immediately, balance due

     ☐  not later than _____ , or
     ☑  in accordance with  ☐ C,   ☐ D,   ☐ E, or   ☑ F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
     imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

     See Page 7.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| GAMAL ABDELAZIZ | Case Number: **1: 19 CR 10080 - 4 - NMG** |
| | USM Number: 55400-048 |
| | Brian T. Kelly, Esq. |
| | Defendant's Attorney |

### THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   **1ss, 2ss**
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C.§§1349, 1341, 1343, and 1346 | Conspiracy to Commit Mail and Wire Fraud and Honest Services Mail and Wire Fraud | 02/28/19 | 1ss |
| 18 U.S.C. § 371 | Conspiracy to Commit Federal Programs Bribery | 02/28/19 | 2ss |

   The defendant is sentenced as provided in pages 2 through   8   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

| |
|---|
| 2/9/2022 |
| Date of Imposition of Judgment |
| |
| /s/ Nathaniel M. Gorton |
| Signature of Judge |
| |
| The Honorable Nathaniel M. Gorton |
| U.S. District Judge |
| Name and Title of Judge |
| |
| 2/23/2022 |
| Date |

**Add. 9**

AO 245B (Rev. 11/16)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page  2  of  8

DEFENDANT:  GAMAL ABDELAZIZ
CASE NUMBER:  **1: 19  CR  10080  - 4  - NMG**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total
term of:      12   month(s)

and 1 day.
This term consists of terms of 12 months and 1 day on Counts 1ss and 2ss, such terms to be served concurrently.

☑  The court makes the following recommendations to the Bureau of Prisons:

That the Defendant be designated to the Satellite Prison Camp at USP, Atwater, CA.

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

   ☐  at  _____  ☐ a.m.  ☐ p.m.   on  _____ .

   ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐  before 2 p.m. on  _____ .

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

Add. 10

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page   3   of   8

DEFENDANT:  GAMAL ABDELAZIZ
CASE NUMBER:  **1: 19  CR  10080   - 4   - NMG**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :          2    year(s)

 This term consists of terms of 2 years on Counts 1ss and 2ss, such terms to run concurrently.

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
         ☑ The above drug testing condition is suspended, based on the court's determination that you
              pose a low risk of future substance abuse. *(check if applicable)*
4.    ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Add. 11

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ___4___ of ___8___

DEFENDANT:  GAMAL ABDELAZIZ
CASE NUMBER:   1: 19 CR 10080  - 4   - NMG

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____        Date _____

AO 245B(Rev. 11/16)    Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page ____5____ of ____8____

DEFENDANT: GAMAL ABDELAZIZ
CASE NUMBER: **1: 19  CR  10080   - 4    - NMG**

## SPECIAL CONDITIONS OF SUPERVISION

1. You must complete 400 hours of community service at an agency approved by the Probation Office.
2. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.
3. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.
4. You must provide the Probation Office access to any requested financial information, which may be shared with the Financial Litigation Unit of the U.S. Attorney's Office.

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___6___ of ___8___

DEFENDANT: GAMAL ABDELAZIZ
CASE NUMBER: **1: 19 CR 10080 - 4 - NMG**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ 250,000.00 | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $         0.00 | $         0.00 |  |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 5A — Criminal Monetary Penalties

Judgment—Page   7   of   8

DEFENDANT:   GAMAL ABDELAZIZ
CASE NUMBER:   **1: 19  CR  10080   - 4   - NMG**

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

It is further ordered that the defendant shall pay to the United States a fine of $250,000.
This consists of $125,000 on each count.
It is further ordered that the defendant shall make a lump sum payment of $250,000 which is due within 60 days of
sentencing.

Any fine imposed is to be continued to be paid until the full amount, including any interest required by law, is paid. All fine
payments shall be made to the Clerk, U.S. District Court. The defendant shall notify the United States Attorney for this
district within 30 days of any change of mailing or residence address that occurs while any portion of the fine remains
unpaid.

Judgment — Page ___8___ of ___8___

DEFENDANT: GAMAL ABDELAZIZ
CASE NUMBER: **1: 19 CR 10080 - 4 - NMG**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ __200.00__ due immediately, balance due

        ☐ not later than _____ , or
        ☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☑ Special instructions regarding the payment of criminal monetary penalties:

    See Page 7.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

Add. 16