No. 22-1129

_____

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

_____

UNITED STATES OF AMERICA

v.

GAMAL ABDELAZIZ,

Defendant-Appellant.

_____

On Appeal from the U.S. District Court
for the District of Massachusetts
No. 19-cr-10080
Hon. Nathaniel M. Gorton

_____

**REPLY BRIEF OF DEFENDANT-APPELLANT
GAMAL ABDELAZIZ**

_____

Brian T. Kelly
Joshua C. Sharp
Lauren A. Maynard
NIXON PEABODY LLP
53 State Street
Boston, MA 02109
(617) 345-1000
bkelly@nixonpeabody.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………iii

INTRODUCTION……………………………………………………………………1

ARGUMENT…………………………………………………………………………10

I.   There Was No Bribery ..........................................................................10

II.  There Was No Property Fraud ...............................................................12

III. There Was a Prejudicial Variance.........................................................13

   A.  Variance and Evidentiary Spillover ...............................................13

   B.  Venue...............................................................................................17

IV. The Excluded USC Evidence Was Relevant .......................................22

V.  The Excluded USC Chat Was Not Hearsay .........................................25

VI. The "Consensual Wiretap" Recordings Should Have Been
     Suppressed...........................................................................................27

CONCLUSION…………………………………………………………………....29

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Grunewald v. United States,*
353 U.S. 391 (1957) ................................................................. 19

*United States v. Cordero,*
668 F.2d 32 (1st Cir. 1981) ............................................. 21, 22

*United States v. Fernandez,*
722 F.3d 1 (1st Cir. 2013) ...................................................... 11

*United States v. Figueroa,*
818 F.2d 1020 (1st Cir. 1987) .............................................. 26

*United States v. Glenn,*
828 F.2d 855 (1st Cir. 1987) ........................................... 17, 22

*United States v. Gonzalez,*
905 F.3d 165 (3d Cir. 2018) .................................................. 27

*United States v. Jurado-Nazario,*
979 F.3d 60 (1st Cir. 2020) .................................................. 27

*United States v. Monserrate-Valentin,*
729 F.3d 31 (1st Cir. 2013) .................................................. 14

*United States v. Morrow,*
39 F.3d 1228 (1st Cir. 1994) ................................................ 19

*United States v. Ouimette,*
753 F.2d 188 (1st Cir. 1985) ................................................ 27

*United States v. Pelullo,*
14 F.3d 881 (3d Cir. 1994) ................................................... 13

*United States v. Rommy,*
506 F.3d 108 (2d Cir. 2007) ........................................... 18, 22

*United States v. Twitty*,
   72 F.3d 228 (1st Cir. 1995) .................................................. 18

*United States v. Valenzuela*,
   849 F.3d 477 (1st Cir. 2017) ............................................. 21

*United States v. Wright*,
   665 F.3d 560 (3d Cir. 2012) ...................................... 12, 13

## Statutes

18 U.S.C. § 666 .................................................................. 11

18 U.S.C. § 1956 .............................................................. 19

18 U.S.C. § 2511 ................................................... 27, 28, 29

## Other Authorities

30B Fed. Prac. & Proc. Evid. § 6724 .................................... 25

Fed. R. App. P. 32 .............................................................. 30

Fed. R. App. P. 28 .............................................................. 29

Finman, Implied Assertions as Hearsay, 14 Stan. L. Rev. 682 ............ 25

# INTRODUCTION

The government claims it tried a case about a "sprawling conspiracy that extended coast to coast" which, in addition to the two defendants, included "dozens of others." A992 (government's opening statement). But this was not a trial about Gamal Abdelaziz's knowledge of or intent to join that "sprawling" conspiracy. *See infra* III. After securing a conviction tainted by evidence of other parents' wrongdoing, the government states that the district court held "a multi-week trial encompassing hours of testimony about defendants and their children and *dozens of* defendants' own emails, text messages, and phone calls." Opp.114[1] (emphasis added). That is misleading.

- Fourteen witnesses testified for the government. Zero of them ever met or spoke to Abdelaziz. Only one had any email exchanges with Abdelaziz.

- The government introduced twenty-one audio recordings. Abdelaziz participated in two of them (i.e., less than 10%).

- The recordings lasted approximately 230 minutes. The calls with Abdelaziz lasted ten minutes (i.e., less than 5%).

---

[1] Citations prefixed "Opp." are to the government's brief, those prefixed "A-Br." are to Abdelaziz's opening brief, those prefixed "W-Br." are to Wilson's opening brief, and those prefixed "ASA" are to Abdelaziz's supplemental appendix.

- The government offered several text messages, but none with Abdelaziz.

- Of the approximately 100 emails the government introduced, Abdelaziz sent or received less than thirty of them.

- There was no evidence that the two defendants knew each other or ever communicated with one another.

The prejudice to Abdelaziz from evidence of other parents' guilt was real and overwhelming. It included evidence of other parents who schemed to cheat on the SAT/ACT, arranged for Singer's employees to take courses impersonating their children, and knew they were paying bribes to the pockets of corrupt coaches.

Abdelaziz's defense was his good faith—that he relied on Singer, a trusted family advisor who guided his two older children through the college admissions process. Singer represented that USC welcomed donations in exchange for preferable admissions treatment for practice players or team managers.[2] And Abdelaziz believed him. But against

_____

[2] The government suggests there was no evidence Abdelaziz thought Sabrina might be admitted as a practice player or manager. Opp.17 n.16. But there was ample evidence that this explanation was a standard part of Singer's pitch. *See* A1153-56, A1710-12, A2416-19. Singer's website even contained testimonials from former clients about him helping them obtain manager positions. A4890-91. The government wants to have it both ways—Singer's pitch is relevant when inculpatory, but not relevant when exculpatory. *See* Opp.88-89

the overwhelming evidence of other parents' bad faith and clearly criminal conduct, none of Abdelaziz's good faith could have possibly resonated with the jury.

The government claims the evidence at trial "overwhelmingly established [Abdelaziz's] guilt and consciousness thereof," Opp.154, but that is only so based on the government's misrepresentations of what, exactly, the evidence was.

*First*, the government implies that Abdelaziz terminated a legitimate college counselor so he could hire an illegitimate counselor, Singer. Opp.3. Not so. Of course Abdelaziz hired Singer for Sabrina. The family had known Singer for five years by the time Sabrina applied for college, A1262-64, Singer provided legitimate services to Abdelaziz's two older children, A2987-88, and Singer was one of his son's mentors, A2168, A2184. The government never alleged anything improper about Singer's services for the older Abdelaziz children.

*Second,* the government claims Abdelaziz "falsely told Sabrina's other college counselor she was not applying to USC." Opp.11, 108.

---

(citing a "stock part of Singer's pitch" for Defendants' knowledge and intent).

False. The government cites an email from Sabrina's Hong Kong advisor explaining that USC has "a December 1st deadline that is said to be for merit scholarship consideration … as well as a regular deadline of January 15th." *Id.* (citing A4487). The government manipulates the words, writing that Abdelaziz said Sabrina would "'pass on applying' *to USC*." Opp.11 (emphasis added). The email actually states Sabrina would "pass on applying *in December*," A4487 (emphasis added), which happened to be true. Of course, the government omitted the stipulation that Sabrina re-took the SAT on December 2, 2017, and therefore could not possibly have submitted her application by December 1st. *See* A3215.

*Third*, the government maintains there was overwhelming evidence that "Abdelaziz, Singer, Heinel, and others set about creating a falsified profile." Opp.5. But there was zero evidence that Abdelaziz provided any false information. Abdelaziz knew Singer was creating a profile, and Abdelaziz provided truthful information for the profile. But he never knew it would contain lies. The government's careful wording conceals what the documents actually show: Laura Janke asked Singer to send her Sabrina's background information, including accolades.

Janke wrote, "**If they don't have the items pertaining to the sport let me know and I will create.**" Opp.5-6, GSA 148 (emphasis added). The government's brief notes that Singer sent Janke's request to Abdelaziz, *id.,* but fails to note that in doing so, Singer **deleted the incriminating line** about lies. *Compare* GSA 148 *with* A4444. *See also* A1549-52.

*Fourth*, the only Abdelaziz "lie" the government attempted to show was that Abdelaziz sent Singer: "a photograph of a girl dribbling a basketball; the subject was 'Sabrina,' but the photo Abdelaziz sent was not his daughter." Opp.6. This argument is as misleading on appeal as it was at trial.

Over the course of their correspondence, Abdelaziz sent Singer at least thirty-six photos of Sabrina playing basketball for the Hong Kong International School. A4446-60, ASA2-39. In one email, subject "Sabrina Abdelaziz –basketball images," where Abdelaziz sent Singer 460 megabytes worth of images, Abdelaziz wrote:

> I've attached Sabrina's basketball photos as discussed. I'm sorry these are not professional pictures but **you'll recognize Sabrina fro[m] her MVP picture** and you can use ones you find suitable.

ASA1 (emphasis added). Abdelaziz thought Sabrina was MVP of her team, junior varsity or otherwise. In another email, Abdelaziz

forwarded Singer thirty-two of "Sabrina's basketball photos." ASA2. In the emails the government refers to, Abdelaziz sends Singer five pictures within the span of two minutes. *See* A4446-60. One of those pictures—clearly by accident—contained Sabrina's teammates rather than Sabrina. Although Singer used that image, and replied "we will use this one," Abdelaziz could not have known which image Singer selected because Singer did **not** include the image in his reply. *See* A1535-42, A4461. The government capitalized on this coincidence at trial, and tries to do so again before this Court.

*Fifth,* the government argues—without citation—that Abdelaziz "discussed with Singer, Sanford, and others the need to include basketball in the 'activities' section of her formal application to avoid raising red flags." Opp.108. But there is no evidence—zero—that Abdelaziz ever indicated a need to avoid "red flags" or anything of the sort. The term "red flag" was used during trial – but by cooperator **Bruce Isackson,** not Abdelaziz. On a recorded call played at trial, Isackson discussed a payment for having his daughter brazenly cheat on the ACT and inquired how Singer structured his charity to avoid a

"big red flag."[3]  A1118.  It is beyond ironic that, in arguing that spillover

prejudice did not affect Abdelaziz's conviction, the government confuses

(or muddles) the evidence.  **If the government cannot keep straight in**

**its appellate brief which co-conspirator said what, how could the jury be**

**expected to parse the evidence?**

And Abdelaziz never instructed anyone to include basketball in

the "activities" section of Sabrina's application.  Rather, he referred

back to Singer's instructions that one of her essays should discuss—in

Singer's words—"basketball as a[ ]passion."  GSA184-85.  It is

absolutely true that there were lies in the activities section of Sabrina's

application.  But all of those activities were added by Mikaela Sanford,

who did so behind Abdelaziz's back and without his knowledge.  *See*

*generally* A-Br.17-19.

The government prevented Abdelaziz from clearly demonstrating

that Sanford falsified Sabrina's application behind his back.  The

prosecutors made frivolous hearsay objections—contrary to 100-year-old

Supreme Court precedent—that were accepted by the district court.

---

[3] The prosecutor returned to the phrase "red flags" in his closing
argument to the jury about Abdelaziz.  A3652.

Although the government later withdrew its objection after the undersigned informed the United States Attorney that his prosecutors were committing professional misconduct, Abdelaziz was prevented from effectively cross-examining Sanford on this critical issue. *See* A-Br.47-50. Nonetheless, the government doubles-down on this "activities" argument in its appellate brief, strangely suggesting that "defense counsel made fruitful use" of *excluded exhibits* in "cross-examining Sanford." Opp.156.

*Sixth,* the government concedes Abdelaziz "disputed he read the email" containing the false profile, Opp.7 n.7, but fails to acknowledge that the dispute goes much further than that. As the government's FBI witness admitted, there was a question of whether Abdelaziz *received* the profile. *See* A-Br.16-17 ("auto-reply" email regarding changed email address; second Singer email sent to the wrong email address). And the government never accounts for the "elephant in the room": if Abdelaziz saw the profile and was "in on" the scheme, how did he fail to notice that it depicted an African-American woman with glasses rather than Sabrina? *See* A1538, A4466. And wouldn't he have made Singer

correct the picture so as to avoid—in Bruce Isackson's words— "a big red flag"?

*Seventh*, the government indicates that part of the overwhelming evidence of guilt is that Abdelaziz "paid a fake invoice from Singer's sham charity." Opp.108. That begs the question of whether Abdelaziz knew it was a sham. Abdelaziz was introduced to Singer's charity years before Sabrina applied to college, and his son Adam participated in legitimate community service activities with that charity. A2180-82, A4856. The charity was registered with the IRS as a 501(c)(3). And its tax returns, which are open to public inspection, showed donations to USC, exactly as Singer represented to his clients. *See* A2279-86.

*Eighth*, the government claims that, after the indictment, Sabrina was surprised to learn that she was admitted through basketball. Opp.108. False. The cited testimony shows that Sabrina was surprised when she learned of the *false profile*, not that she was surprised that she was admitted through basketball. A1862-63. Abdelaziz never contested that he thought Sabrina would be admitted through basketball; but that does not mean Abdelaziz (or Sabrina) knew about the lies on the profile. Indeed, as the government knows, the

independent USC judicial report found that Sabrina was aware that she would be admitted thorough basketball and that she "reasonably believed that there was a USC committee that could legitimately admit her to USC based on the truthful athletic and academic credentials she provided to her father."  Dkt. 2515 at 5.[4]

***

The evidence of Abdelaziz's intent was not "overwhelming"; it was at best ambiguous and relied not on days of testimony and a mountain of documents, but on two scripted calls lasting a total of ten minutes. The government only secured a conviction because it relied on evidence of other parents' guilt to "fill in the blanks" on Abdelaziz' s intent.

ARGUMENT

## I.   There Was No Bribery

Abdelaziz incorporates Section I of Wilson's Reply.  Unauthorized fundraising[5] may violate policy, but is not a federal crime.  In *Skilling v.*

---

[4] The point here is not to inject the USC report into the trial record, but to show that the government *knows* through both testimony and documents that Sabrina was not surprised she was admitted through basketball.

[5] The district court improperly excluded evidence showing such fundraising was, in fact, authorized.  *See infra* IV.

*United States*, the Supreme Court limited honest services fraud to "bribery and kickbacks" and specifically held that "undisclosed self-dealing . . . *i.e.*, the taking of official action by an employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty" is **not** honest services fraud. 561 U.S. 358, 409-10 (2010). Here, the government's redefinition of bribery to include payments to a principal is simply an attempt to shoehorn into the word "bribery" the very conduct (undisclosed self-dealing) that the Supreme Court excluded from honest services fraud in *Skilling*. Indeed, that is precisely why Judge Talwani ordered a new trial for USC water polo coach Jovan Vavic. *See* ASA96 (treating a payment to USC as a bribe would "resurrect the undisclosed self-dealing theory that the Supreme Court rejected in *Skilling* and make causing reputational harm to one's employer sufficient to support a criminal prosecution under section 1346"). The same is true for 18 U.S.C. § 666, which this Court held extends no further than criminalizing bribery. *See United States v. Fernandez*, 722 F.3d 1, 25-27 (1st Cir. 2013).

## II.    There Was No Property Fraud

Abdelaziz incorporates Section II of Wilson's Reply.  As set forth therein, there is no limit to the government's property fraud theory.

Additionally, Abdelaziz notes that the government does not respond substantively to his argument that the bribery object infected the property fraud object, rendering the entirety of Count One invalid. The district court correctly instructed the jury that Count One required the Defendant to act "with the specific intent to do something that [the law] forbids, that is to say, with bad purpose either to disobey or disregard the law."  A3824, A3830.  But if the "law" defined a donation to a university as a bribe, it naturally followed that the jury would find intent to "disregard the law" for the honest services object.  And that finding of "bad purpose" regarding bribery would inevitably taint the jury's consideration of intent for the property fraud object.  *See generally United States v. Wright*, 665 F.3d 560 (3d Cir. 2012) (noting, as here, "little of the traditional fraud evidence is independent of the honest services fraud evidence").

The bribery object further infected the jury's consideration of the property fraud object because: (1) the government introduced

inflammatory financial material which was only relevant to the bribery object, *see, e.g.*, A2965-93, A4300-02, A4440-43, A4462, A4556, A4839-44, GSA027, GSA269-70, GSA440-47; (2) the government conflated the two objects, A3644 ("This in exchange for that. That's fraud. And it's *also* honest services fraud." (emphasis added)); (3) Abdelaziz could not overcome the negative association with "bribery", *see United States v. Pelullo*, 14 F.3d 881, 899 (3d Cir. 1994) (noting the defendant was "branded" with "decidedly pejorative" terms); and (4) the bribery object affected Abdelaziz's trial strategy– without it, Abdelaziz could have testified without being burdened by a vigorous cross-examination regarding "bribery." *See Wright*, 665 F.3d at 577.

## III. There Was a Prejudicial Variance

### A. Variance and Evidentiary Spillover

Abdelaziz fully incorporates Section III of Wilson's Reply regarding variance and prejudice and adds further argument as set forth below.

The government's opposition does not attempt to address the central premise of Abdelaziz's brief: Even if the single coast-to-coast conspiracy existed, the government failed to "produce evidence from

which a jury could reasonably infer that [Abdelaziz] knew about and agreed to join any larger overarching conspiracy." *United States v. Monserrate-Valentin*, 729 F.3d 31, 45 (1st Cir. 2013) (cleaned up).

At best, the evidence showed: (1) Abdelaziz agreed with Singer to have Sabrina admitted through the "side door" at USC; and (2) one year after Sabrina was admitted (and already attending USC), Singer called Abdelaziz and implied he had done many "side doors" *at USC* and the format he used for Sabrina's profile would be used for subsequent "side doors" *at USC.* That's it. Despite what the government calls a "multi-week trial encompassing hours of testimony about defendants and their children and dozens of defendants' own emails, text messages, and phone calls," Opp.114, **the government fails to identify any additional evidence showing Abdelaziz's knowledge of (or intent to join) the overarching conspiracy.**

Instead, as it did at trial, the government uses evidence of *others'* actions and *others'* intent as a proxy for what Abdelaziz knew or did. In particular, the government highlights that:

- "Parents referred and recruited other parents," Opp.90. (Abdelaziz didn't);

- Some parents inquired about "side doors" at other schools, Opp.89-90, 98-99. (Abdelaziz didn't);

- Some parents were "repeat players," Opp.90-91. (Abdelaziz wasn't);

- "The larger the scheme grew, the more parents had their pick of sports and schools to choose from," Opp.99. (Abdelaziz didn't know that).

The government boldly asserts:

> There is also no serious dispute that the parent-defendants, including Wilson and Abdelaziz, were well aware that Singer's side-door operation involved many other parents, that it had been successful and long-running, and that, by dint of that very success, Singer was able to offer a wider variety of school options and paths to admission.

Opp.89. In fact, there is a serious dispute. There was no evidence Abdelaziz knew the scheme was "long-running," that the "side door" was available outside of USC, or that there were various "paths to admission." The assertion is supported by several citations that are largely unrelated to Abdelaziz: three Wilson calls, one Wilson email, one Caplan call, one Huneeus call, and one Abdelaziz call. The Abdelaziz transcript shows—as conceded—that one year *after* Sabrina was admitted, Singer said the format Singer used for her profile would be used for subsequent "side doors" *at USC*. But even if Abdelaziz learned Singer was helping other kids gain admission to USC, that does not

come close to evidence that Abdelaziz agreed to join the "coast-to-coast" conspiracy alleged in the indictment.[6]

The variance was deeply prejudicial to Abdelaziz for the reasons articulated by Wilson.[7] Evidence of other parents' clearly criminal intent colored the jury's view of the central issue in Abdelaziz's case— whether he acted in good faith, without the intent to bribe or defraud. The government actively encouraged the jury to interpret Abdelaziz's actions and statements in light of the other parents' intent. *See* A3645 ("[Defendants] knew that what they were doing is wrong. One way you know that is because Bruce Isackson told you that he knew it, from that witness stand. . . . He knew, just as Huneeus knew, just as these defendants knew . . . ."); A3646 ("Isackson was worried because he knew that what he was doing was wrong. And the evidence shows that these defendants knew that as well."); A3648 ("Isackson told you that he knew his kids' profiles were fake . . . . And the same is true of Gamal Aziz."); A3663 ("[Abdelaziz] was worried for the same reason Bruce

---

[6] As noted in Abdelaziz's opening brief, the government's evidentiary failings in this regard are tied to its decision not to call Singer.

[7] And as set forth *supra* pp.1-10, the evidence against Abdelaziz was certainly not overwhelming.

Isackson was worried . . . because he knew, just like Bruce Isackson knew, [that it was a bribe]"); A3772 ("And Bruce Isackson told you he knew the same thing . . . ."). *United States v. Martinez* is directly on point. *See* 994 F.3d 1, 15 (1st Cir. 2021) (noting the "evidence risked leading the jury in considering [defendant's] charges to impute the states of mind of [others] . . . based on the direct evidence of their intent that was introduced").

### B. Venue

If there was a variance, the jury determined venue for the wrong conspiracy, and the Court must evaluate venue for the separate Abdelaziz conspiracy. *United States v. Glenn*, 828 F.2d 855, 860 (1st Cir. 1987). The government's venue claims on the separate Abdelaziz conspiracy are exceedingly weak. They rely exclusively on:

- an October 25, 2018 scripted call to Abdelaziz;
- a January 3, 2019 scripted call to Abdelaziz; and
- a January 3, 2019 check Singer sent to Heinel.

Singer was a government agent in all three cases and all three events occurred after the Abdelaziz/Singer conspiracy to admit Sabrina as an athlete was complete. In fact, Sabrina was already attending USC. She was provisionally admitted **over a year prior**, in October 2017, A1307-

08, A4480, and received her final admission letter in March 2018, *see* A1803. Abdelaziz paid KWF in March 2018. A2986-87.

The government declines to address (or even mention) the AUSA's and federal agents' extraordinary **sworn affidavits** that the scripted calls "concern historical conduct" and that Abdelaziz had "completed the fraud and bribery scheme" when Singer made the calls. *See* A-Br.37-38. The government also fails to address Abdelaziz's most basic point: Abdelaziz did not use the scripted calls to "to further[] a conspiratorial goal," *United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007), rendering the calls useless for venue regardless of when the conspiracy ended.

Ignoring these basic points, the government counters that the conspiracy continued through January 2019 because: (1) concealment was ongoing; and (2) Heinel received payments. Opp.116-17.

For concealment, the government doesn't even try to establish the "special requirements of proof" which could prove a conspiracy to conceal, *United States v. Twitty*, 72 F.3d 228, 233 (1st Cir. 1995), and instead points only to the indictment itself. *See* Opp.117. The government's cited case, *Upton,* is of no help because the government

there charged a money-laundering conspiracy to violate 18 U.S.C. § 1956(a)(1)(B) (i.e., "to conceal or disguise"). 559 F.3d 3, 10-11 (1st Cir. 2009). In other words, special proof was not needed because concealment was the objective of the conspiracy. *Id.* Here, concealment was not the objective of the conspiracy. Indeed, if concealment could be read into this conspiracy, it could be read into every conspiracy. *See Grunewald v. United States*, 353 U.S. 391, 402 (1957).

And while Heinel received personal payments from July 2018 through the time of her arrest, the payments were unrelated to any agreement with Abdelaziz. Abdelaziz paid $300,000 in March 2018 to Singer's charity. A2986-87, GSA268. It is undisputed that he thought **(and was told)** the money would flow to USC and he had no idea that it would be paid to a USC employee's pocket. *See* A318, A376, A995, A3653. Sometime *after* Abdelaziz made his payment, Heinel and Singer entered into a *separate agreement* whereby Heinel would receive a $20,000 per month personal retainer. *See generally* A-Br.19-21. The government has disclaimed that Abdelaziz was party to this "side deal," which was a separate conspiracy. *Cf. United States v. Morrow*, 39 F.3d 1228, 1234 (1st Cir. 1994) (some defendants part of an overall

conspiracy and others only sub-conspiracies because "'scope' is to be resolved by asking what the defendant agreed to do, or at least knew to be likely.").

Although the government claims the January 2019 check was an "installment payment to Heinel for her recruitment of Abdelaziz's daughter and others," Opp.116, they cite nothing more than a copy of the check itself. Nothing connects the January 2019 check to *Sabrina's* admission. To the extent the check suggests anything, its memo line reads: "Bishops School, Harvard Westlake," indicating it was a payment for students who attended those schools, not for Sabrina (who attended school in Hong Kong). A4813-17. The January 2019 payment was likely for students Singer was working with *at that time*, not an "installment" payment for someone admitted to USC over a year prior. Indeed, according to the government's logic, *all* of Heinel's ongoing retainer payments—in perpetuity, had she not been arrested— were related to Sabrina's admission (and every other child's admission). That can't be true. It is simply a backdoor way of rehashing the argument that Abdelaziz was part of the overall conspiracy.

Finally, aside from his hearsay statement that he was "in Boston," there was no evidence Singer was present in Boston during the calls. The closest the government comes is noting Singer was in Boston "that same day," Opp.116, but even that statement is suspect. *See* A-Br.40-42. And even if Singer *was* in Boston during the calls, that alone would not create venue for the Abdelaziz/Singer conspiracy. In the only case the government cites showing a phone call from a government agent suffices for venue, the defendant "knew the offense was bound for completion in Puerto Rico.[8] It is not as if [cooperator] were a traveler making chance use of a telephone at a bus stop [in Puerto Rico]." *United States v. Cordero*, 668 F.2d 32, 44 (1st Cir. 1981). Here, on the other hand, there is no connection whatsoever to Massachusetts aside from the scripted call placed by the government agent.[9] *See also*

---

[8] The government also cites a venue entrapment case, *United States v. Valenzuela*, 849 F.3d 477 (1st Cir. 2017). But Abdelaziz never argued venue entrapment. In a venue entrapment case, venue is proper, but the government may have used illicit means to create venue.

[9] As to the check, if Singer actually *procured* it in Boston (which is the only alleged connection) that too would be insufficient. No court has ever held that a government agent who procures a check in a district and later sends it from an unknown location to another unknown location has generated venue in what might be termed the "district of check printing."

*Rommy*, 506 F.3d at123-24 ("Like *Cordero*, then, this is not a case in which venue . . . is the product of some 'chance use of a telephone' by a government agent.").[10]

## IV. The Excluded USC Evidence Was Relevant

The government mocks Abdelaziz for his "anemic assertions" that the USC evidence "shows the reasonableness of him believing USC exchanged money for athletic admissions." Opp.126. But those "anemic assertions" are precisely the basis on which Judge Kelley denied USC's motion to quash the Rule 17(c) subpoenas. *See* A-Br.45-47.

The substantive argument—USC evidence was only relevant if there were "tangible signs" that Abdelaziz believed "that USC as an institution sold athletic admission slots for money"—also ignores the magistrate's findings. *See, e.g.*, SA115-116. Abdelaziz proffered substantial documentation showing that, as part of his "pitch," Singer regularly described the "side door" as a legitimate way that universities do business. *See generally* W-Br.72-74. Indeed, Abdelaziz's entire defense was that he lacked the intent to defraud because he thought he

---

[10] In the First Circuit, when the government fails to prove venue, the indictment is dismissed. *United States v. Glenn*, 828 F.2d 855, 863 (1st Cir. 1987) (Breyer, J.).

was acting in accordance with USC's wishes. *See* A1016-17, A1019, A1022, A1024, A3689, A3691, A3694-95.

The government cannot distinguish *United States v. Litvak,* where the district court excluded evidence that the defendant's supervisors approved of *other employees'* similar conduct. 808 F.3d 160, 190 (2d Cir. 2015). In language mirroring Judge Gorton's, the district court found such evidence irrelevant because "[I]f it is something [defendant] didn't know, then it can't go to a state of mind." *Id.* at 189 n.35. In finding the district court "exceeded its allowable discretion," the Second Circuit stated that the evidence "would support [defendant's] attempt to [show] . . . he held an honest belief that his conduct was not improper or unlawful, a belief the jury may have found more plausible in light of his supervisors' approval of his colleague's substantially similar behavior." *Id.* at 190.

The government also suggests that the USC evidence might be relevant if Abdelaziz testified he held a "*contemporaneous belief*" of USC's admissions practices. Opp.126. That is a curious position. As the government itself acknowledges, Judge Gorton required more than contemporaneous belief—he declared all USC evidence *irrelevant*

unless Abdelaziz proffered *knowledge* of the evidence he sought to introduce. *See* Opp.127 n.40. *See also* A569; Wilson Add.65 ("Defendants proffered no evidence to suggest that they had any knowledge of the students referred to in the document at issue or their admissions processes."). After capitalizing on that legal error throughout the trial, *see, e.g.*, A1931-32, A1936, the government cannot now claim that Abdelaziz must blame himself for failing to testify to his belief when the district court required *knowledge*.

Nor would testimony be required in any case. Although defendants testified in most of the cases cited by Abdelaziz, those cases involved, for instance, idiosyncratic defenses that ingested cocaine was actually diamonds or gold. And in *United States v. Lachman*, defendants moved for a new trial upon discovering evidentiary support for a novel interpretation of export regulations which supported a defense *they never presented at trial.* 521 F.3d 12, 18-19 (1st Cir. 2008). In the only fraud case of the bunch, *United States v. Litvak* (set forth above), the defendant did not testify.

## V. The Excluded USC Chat Was Not Hearsay

The government argues that the USC admissions officers' "chat" is hearsay because of the *implied* assertions contained therein. Notably the government never took this position below, and the district court did not exclude it on this basis.[11] Implied assertions are "the ninth circle" of Dante's hell, 30B Fed. Prac. & Proc. Evid. § 6724, and the Court need not break new ground to determine whether "LOL" and "haha" are implied assertions.[12] Even if those "statements" *impliedly* asserted that Sabrina was not a first-rate athlete, the evidence was still admissible. Abdelaziz was not using the chat to prove that Sabrina was

---

[11] The government further argues Abdelaziz did not address the district court's erroneous evidentiary rulings. But Abdelaziz quoted Judge Gorton's most relevant oral ruling (nearly identical to his cursory treatment at Wilson Add.44). A-Br.51-52. And the one sentence at Wilson Add.51-52 merely discusses an example Abdelaziz had provided to the district court.

[12] This isn't an "implied assertion" case. "Reliance on an implied assertion involves the following reasoning process. The fact finder is informed by testimony that X engaged in certain conduct. This conduct is not a direct assertion of f, the disputed fact, but the fact finder is asked to infer from the conduct that X believes f to be true. Having made this inference, the finder must then infer from X's belief in f that f is true." Finman, Implied Assertions as Hearsay, 14 Stan. L. Rev. 682, 685. Here, f (Sabrina's basketball skills) are not in dispute.

not a first-rate athlete.  Indeed, Sabrina's basketball skills were not in dispute.  Rather, Abdelaziz used the chat to show Bradshaw's and Alvendia's *knowledge* that Sabrina was not a first-rate athlete.  And Abdelaziz was entitled to ask the jury to infer both from that knowledge, and from their tone, that *they did not care*.  Quite simply, "Statements proffered to show something other than the accuracy of their contents—to show, say, the knowledge or state of mind of the declarant or one in conversation with him—are not considered hearsay." *United States v. Figueroa*, 818 F.2d 1020, 1026 (1st Cir. 1987).

The result is the same even if the "implied assertion" is itself that Bradshaw and Alvendia did not care whether recruited athletes played sports.  In other words, Bradshaw and Alvendia were aware of Sabrina's lack of first-rate basketball skills and they were impliedly "asserting" that this knowledge was not causing them surprise or distress, but indifference.  If interpreted this way, the chat is also admissible under Rule 803(3).  *See United States v. Gonzalez*, 905 F.3d 165, 200–01 (3d Cir. 2018).[13]

---

[13] Abdelaziz has not waived 803(3) because it is necessary to rebut the government's implied assertion argument, which was raised for the first

The government's retort that "the district court invited defense counsel to call [Bradshaw and Alvendia] as witnesses," Opp.141, is beside the point.  *See United States v. Ouimette*, 753 F.2d 188, 192 (1st Cir. 1985) ("A defendant cannot be penalized by the exclusion of otherwise admissible [evidence] because his counsel has chosen to proceed in a manner which requires a difficult ruling by the court.").

## VI. The "Consensual Wiretap" Recordings Should Have Been Suppressed

The wiretap issue is not waived.  Abdelaziz addressed why 18 U.S.C. §§ 2511(2)(c)-(d) are inapplicable to technical assistance provided by AT&T, *see* A-Br.58 n.18, which the district court found authorized such assistance.  ASA36-37.  Those provisions speak of permission "to intercept" communications.  But § 2511(2)(ii), which is specific to wire service providers, speaks of "technical assistance to persons authorized by law to intercept wire[s]."  Such persons "authorized by law" include those referenced in §§ 2511(2)(c)-(d).  Under the government's reading, AT&T would be providing technical assistance to itself.

<hr>

time on appeal.  *United States v. Jurado-Nazario*, 979 F.3d 60, 62 (1st Cir. 2020).

As to timeliness, the government overstates its disclosures prior to Agent King's August 2021 affidavit. The "background" section of its brief identifies two factual errors in the documents provided to Defendants in 2019 and relies on affidavits submitted by Agent King in August and November 2021 to explain what happened in 2018. Opp.160-62. Clearly the government's letter to AT&T was insufficient to alert Abdelaziz to the government's extraordinary wiretap procedures. The government never even provided AT&T's response to the letter until fall 2021, leaving Abdelaziz with the government's representation to Judge Burroughs that "monitoring" ceased in August 2018. A-Br.8, 55-56. No wonder Judge Talwani found that Agent King's affidavit is what notified defendants of the government's wiretap procedures.

Substantively, the government's reference to § 2511(3)(b)(i) is off base. That section concerns whether a provider may "*divulge*" the contents of a communication. It does not speak to § 2511(2)(ii)'s separate requirements for provision of "technical assistance to persons authorized by law to intercept wire[s]," which in this case facilitated a five-month wiretap with no minimization or court authorization. And

the government's citation to Judge Talwani's opinion fails to address the textual issues regarding §§ 2511(2)(c)-(d) identified above. The government's arguments on suppression also miss the mark. The necessity of the § 2511(2)(ii) procedure is demonstrated in part by the various errors that were present in this case: misdating the letter to AT&T, misrepresenting the process to Judge Burroughs, and most importantly, obtaining written consent for the wrong phone. A-Br.56-57.

## CONCLUSION

For the foregoing reasons, the Court should enter a judgment of acquittal on both counts, or at a minimum, dismiss the indictment or grant Abdelaziz a new trial on both counts.[14]

Dated: September 23, 2022       Respectfully submitted,

                                /s/ *Brian T. Kelly*
                                Brian T. Kelly
                                Joshua C. Sharp
                                Lauren A. Maynard
                                NIXON PEABODY LLP
                                53 State Street
                                Boston, MA  02109

---

[14] Under Fed. R. App. P. 28(i), Abdelaziz adopts parts I to IV of Wilson's Reply.

617-345-1000
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com
lmaynard@nixonpeabody.com

*Counsel for Defendant-Appellant*
*Gamal Abdelaziz*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the length limitations set by this Court's Order of July 22, 2022.  The brief contains 5580 words, excluding the items exempted by Fed. R. App. P. 32(f).

2.     This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).  It was prepared using Microsoft Office Word 2016 in 14-point, proportionally spaced Century font.

Dated:  September 23, 2022          */s/ Brian T. Kelly*
                                    Brian T. Kelly
                                    *Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I certify that on September 23, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. Counsel for the United States are registered CM/ECF users and will be served by the CM/ECF system.

Dated: September 23, 2022

*/s/ Brian T. Kelly*
Brian T. Kelly
*Counsel for Defendant-Appellant*